# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

COMMONWEALTH *vs*. DAVID R. CLARK.

Plymouth. March 7, 2000. - June 29, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, IRELAND, SPINA, & COWIN, JJ.

*Practice, Criminal,* Venue, Empanelment of jury, Cameras in court room, Admissions and confessions, Voluntariness of confession, Waiver, Voir dire, Instructions to jury, View, Capital case. *Jury and Jurors. Constitutional Law,* Fair trial, Public trial, Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions, Verbal completeness, Spontaneous utterance, Relevancy and materiality. *View. Waiver. Homicide.*

At a murder trial, the judge did not abuse his discretion or commit an error of law in denying the defendant's motion for a change of venue. [5-6]
At a murder trial, there were no special circumstances demonstrated to justify limitations under S.J.C. Rule 3:09, Canon 3 (A) (7), on recording and broadcasting coverage of the trial by television and radio. [7-9]
The record of a murder trial did not support the defendant's claim on appeal

that he was prejudiced by the presence of the electronic media in the court room during the trial. [9-10]

At a murder trial, the judge did not err in declining to sequester the jurors, and the fact that the judge excused two of three jurors who reported, in response to the judge's instructions, exposure to extraneous influences unrelated to trial publicity, did not render the judge's decision not to sequester the jury an error of law or an abuse of discretion. [10-11]

At a murder trial, the judge's findings of fact in his denial of the defendant's motion to suppress his statements to police were supported by the evidence and in turn supported his conclusion that the defendant's statements were voluntary. [12-13]

A statement of the defendant as he was being handcuffed, in response to a police officer's inquiry if there was anyone else with the defendant, was properly admissible in evidence even though the defendant had not yet been advised of his Miranda warnings, where the inquiry was made out of a concern for public safety; thus, the defendant's responses were admissible on the basis of *New York* v. *Quarles*, 467 U.S. 649, 657 (1984). [13-14]

The doctrine of verbal completeness was not applicable to render admissible certain self-serving statements of a defendant charged with murder in the first degree. [14-15]

A criminal defendant's spontaneous inculpatory statement that he was left-handed, made in response to a routine procedural request by police at the time of booking and not in response to interrogation, was admissible at trial. [15-16]

At a murder trial, the judge did not abuse his discretion in allowing the Commonwealth's request for a view of the murder site. [16-17]

The judge at a murder trial did not abuse his discretion or otherwise err in declining to excuse certain jurors, where the record of the proceedings did not demonstrate that there was a substantial risk that any of those jurors was affected by an extraneous influence. [17-18]

There was no basis in the record of a murder trial to warrant a conclusion that the judge abused his discretion in declining to excuse certain jurors, questioned individually, for cause [18-19], or in declaring certain other jurors indifferent [19].

At a murder trial, evidence of the defendant's parole status at the time of the crime was properly admissible as relevant and probative and the judge's thorough limiting instructions minimized any prejudicial effect. [19-21]

At a murder trial, no manslaughter instruction was warranted on any view of the evidence. [21]

INDICTMENT found and returned in the Superior Court Department on September 6, 1994.

Pretrial motions were heard by *Robert L. Steadman*, J.; interlocutory review was had in the Supreme Judicial Court for the county of Suffolk before *Greaney*, J., and *O'Connor*, J.; and the case was tried before *Patrick F. Brady*, J.

*John H. Cunha, Jr.* (*Charles Allan Hope* with him) for the defendant.

*Robert C. Thompson*, Assistant District Attorney (*James M. Sullivan*, Assistant District Attorney, with him) for the Commonwealth.

ABRAMS, J. A jury convicted the defendant, David R. Clark, of murder in the first degree based on a theory of deliberate premeditation. The defendant claims error arising from the denial of his pretrial motions. The defendant also alleges that the judge erred in allowing a view of the murder site; in declining to excuse certain jurors for cause; and in failing to instruct the jurors on manslaughter. Further, the defendant claims that a single justice of this court erred in upholding a ruling by the motion judge that evidence that the defendant was on parole at the time the murder took place was admissible. Finally, the defendant urges that we exercise our power under G. L. c. 278, § 33E, to order a new trial. We affirm the conviction of murder in the first degree. We also conclude that there is no basis for ordering a new trial or entry of a lesser degree of guilt pursuant to our power under G. L. c. 278, § 33E.

1. *Facts.* "We summarize the facts as the jury could have found them in the light most favorable to the Commonwealth, reserving certain facts for discussion in conjunction with other issues." *Commonwealth* v. *Federici*, 427 Mass. 740, 741 (1998), citing *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 153 (1997). See *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985).

A. *The exchange of gunshots.* On September 2, 1994, Trooper Mark Charbonnier was on patrol on Route 3. At 3:03 A.M., Trooper Charbonnier radioed the State police dispatch office, reporting that he was stopping at a rest area. Shortly thereafter, Trooper Charbonnier, with his police cruiser's lights flashing, pulled over the defendant's van. Trooper Charbonnier parked his cruiser behind the van and approached the driver's side door of the van with his flashlight in his hand.

There was an exchange of gunfire, and both the defendant and Trooper Charbonnier were injured. At 3:13 A.M., Trooper Charbonnier again radioed the dispatch office, reporting that shots had been fired. He requested an ambulance.

B. *After the shooting.* Off-duty Boston special police Officer

David Spiers,[1] who was watching television in the home of a friend, heard five gunshots. Spiers went to investigate, heading toward a fence that abutted the embankment of Route 3. Using his flashlight, Spiers observed the defendant on the ground, inching toward the fence. Spiers climbed over the fence and asked the defendant if he needed help. The defendant, who had been shot in the head and arm, moaned in response.

At approximately the same time, Trooper Sean Chicoine, who heard Trooper Charbonnier's radioed report of "shots fired," arrived in his police cruiser. Trooper Chicoine ran to Trooper Charbonnier, who was lying on the ground behind the van with his gun in his hand. The gun pointed in the direction of the embankment abutting Route 3.

Trooper Charbonnier said, "I have been shot. Get an ambulance." Trooper Chicoine radioed for assistance. He then began to look in the direction that Trooper Charbonnier's gun was pointing. Trooper Chicoine saw Spiers's flashlight and ordered Spiers to freeze. After Spiers satisfactorily identified himself as a Boston special police officer, Trooper Chicoine turned his attention toward the defendant, who was inching toward the fence. Trooper Chicoine ordered the defendant to show both his hands three times before the defendant complied. Then, Trooper Chicoine handcuffed the defendant.

At this time, other law enforcement and medical personnel began to arrive. Officers and personnel from the State, Kingston, Duxbury, and Plymouth police departments and the Kingston fire department arrived. Officer Loren Frost of the Kingston police department arrived in time to assist Trooper Chicoine in handcuffing the defendant. Once the defendant was secured, Trooper Chicoine proceeded down the embankment to check on Trooper Charbonnier. Officer Frost remained with the defendant and asked him whether he was alone. The defendant answered affirmatively. Officer Frost then began to pull the defendant down the embankment, at which point the defendant requested medical attention. Medical personnel treated the defendant and Trooper Charbonnier on the scene. Both were transported to Boston hospitals for treatment. Trooper Charbonnier bled to death from a bullet wound to his abdomen.

C. *Evidence linking the defendant to the crime.* The bullet

---

[1]Officer David Spiers said he was a "Boston [s]pecial [p]olice Officer employed by . . . New World Security." Spiers was qualified as a special police officer in connection with his employment.

that killed Trooper Charbonnier was fired by a .32 caliber pistol found eight feet from where the defendant was located when Spiers first saw him. Markings in the vegetation and scattered belongings of the defendant indicated that the defendant had crawled from the location where the murder weapon was found. Deoxyribonucleic acid (DNA) testing revealed that blood found on the murder weapon was consistent with that of the defendant. Bullets from Trooper Charbonnier's gun were found in the defendant's head and left arm.[2]

In addition, a gym bag was found in the defendant's van containing another gun, two ski masks, and a police badge. To suggest the defendant's motive, the Commonwealth offered evidence that the defendant had been on parole and that the contents of the bag, if found, would have resulted in the defendant being returned to prison. The defendant previously had vowed never to be returned to prison.

Testimony by acquaintances of the defendant also linked the defendant to the murder weapon. According to a friend whom the defendant had visited earlier that evening, the defendant had taken a gun out of his gym bag and placed it in the left pocket of his pants.[3] Fibers found on the murder weapon were consistent with the defendant's underwear.

2. *The defendant's pretrial motions.* A. *Change of venue.* Because of the massive publicity surrounding the killing of Trooper Charbonnier, the defendant filed a pretrial motion for a change of venue pursuant to Mass. R. Crim. P. 37 (b) (1), 378 Mass. 914 (1979). According to the defendant, "[t]he dramatic and sustained publicity concerning the incident and its aftermath," as well as "the establishment of a roadside shrine [on Route 3] and the prominence of Route 3 as a travel route," made it impossible to select a fair and impartial jury. The defendant claims that the judge's denial of his motion for change of venue was prejudicial error. We do not agree.

A judge may, on his or her own motion or on motion of a

---

[2]Because the defendant is left-handed, the fact that he was shot in his left arm indicated that he might have been holding that arm outward in order to fire a gun. That Trooper Charbonnier's bullets were found in the defendant's left hand may have raised an inference that Trooper Charbonnier fired in response to the defendant's gunshots.

[3]On another occasion, the defendant showed the same friend two guns that looked similar to the gun that killed Trooper Charbonnier and the gun found in the gym bag.

party, order a change of venue where "there exists in the community where the prosecution is pending so great a prejudice against the defendant that he may not there obtain a fair and impartial trial." Mass. R. Crim. P. 37 (b) (1). See *Commonwealth* v. *Angiulo*, 415 Mass. 502, 515 (1993). "The mere existence of pretrial publicity, even if it is extensive, does not constitute a foundation of fact sufficient to require a change of venue." *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 551 (1990), and cases cited. See *Commonwealth* v. *Angiulo, supra*; *Commonwealth* v. *Turner*, 371 Mass. 803, 807 (1977). "A trial judge should exercise his [or her] power to change the venue of a jury trial 'with great caution and only after a solid foundation of fact has been first established.' " *Commonwealth* v. *Colon-Cruz, supra*, quoting *Commonwealth* v. *Smith*, 357 Mass. 168, 173 (1970), and cases cited. See *Commonwealth* v. *James*, 424 Mass. 770, 775 (1997).

The judge did not abuse his discretion or commit an error of law in denying the defendant's motion for a change of venue. The judge conducted an individual voir dire of each prospective juror and, in many cases, made further inquiry at the suggestion of defense counsel. Only jurors who told the judge that they could be fair and impartial were determined by the judge to be indifferent. The judge noted that it was within his discretion to accept each juror's statements that he or she would decide the case on the evidence presented in the court room. See *Commonwealth* v. *Colon-Cruz, supra*.

The defendant next asks us to consider an additional factor in assessing whether the judge improperly denied the motion for a change of venue. The defendant observes that approximately thirty-five per cent of prospective jurors were excused at least in part because they were prejudiced by exposure to publicity about the case. According to the defendant, the fact that more than one-third of the jury venire had been prejudiced indicates that it was impossible to empanel an impartial jury. The argument has no merit. See *Commonwealth* v. *Angiulo, supra* at 515 (no rational basis to conclude venire prejudiced where forty-two per cent of venire excused); *Commonwealth* v. *Duddie Ford, Inc.*, 409 Mass. 387, 393 (1991) ("The fact that many of those who did present themselves for individual examination said that they would be biased against Duddie Ford does not suggest that there was a substantial risk that those who did not come forward were also biased").

B. *Media presence in the court room.* The defendant filed a pretrial motion to preclude various types of media coverage. The motion judge, who was not the trial judge, issued an order prohibiting the recording or broadcasting of pretrial hearings concerning the suppression of contested evidence. See S.J.C. Rule 3:09, Canon 3 (A) (7) (b), as appearing in 387 Mass. 1218 (1983) (in effect at time of trial). Subsequently, the motion judge issued a second order prohibiting the recording or broadcasting of the trial except for opening and closing arguments, the jury charge, the rendering of the verdict, and sentencing.

Some members of the media[4] filed an emergency motion to intervene and for reconsideration of the judge's order barring electronic media. The motion judge allowed the media to intervene but declined to alter the order banning electronic recording or broadcasting of the proceedings. These members of the media sought relief from a single justice of this court pursuant to G. L. c. 211, § 3. The defendant intervened in that proceeding. The single justice determined that there were "no special circumstances justifying the limitation" on media coverage of the trial and allowed the recording and broadcasting of the trial by television and radio. The defendant asserts that the single justice's decision was erroneous and that, by allowing television cameras in the court room, the single justice compromised the defendant's right to a fair trial. We disagree.

Supreme Judicial Court Rule 3:09, Canon 3 (A) (7), states the general rule that "[a] judge shall permit broadcasting, televising, electronic recording, or taking photographs of proceedings open to the public in the courtroom by the news media for news gathering purposes and dissemination of information to the public, subject, however, to [certain] limitations." A judge may exclude electronic media "if it appears that such coverage will create a substantial likelihood of harm to any person or other serious harmful consequence." S.J.C. Rule

---

[4]These members were the Hearst Corporation, doing business as WCVB-TV Channel 5 and doing business as New England Cable News; Westinghouse Electric Corporation, doing business as WBZ-TV Channel 4; WGBH Educational Foundation, known as WGBH Channel 2; Sunbeam Television Corporation, doing business as WHDH-TV Channel 7; and the Radio-Television News Directors Association. On the result we reach, we need not address the Commonwealth's question whether the plaintiffs in the original single justice action were necessary parties to the claim.

3:09, Canon 3 (A) (7) (a). See *Boston Herald, Inc.* v. *Superior Court Dep't of the Trial Court,* 421 Mass. 502, 507 n.8 (1995).

Our guidelines "were designed to 'provide insofar as possible, the opportunity for full and unrestricted coverage' of judicial proceedings." *Commonwealth* v. *Burden,* 15 Mass. App. Ct. 666, 677 (1983). "Generally, public access to judicial proceedings may not be abridged absent 'an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' *Press-Enterprise I* v. *Superior Court,* [464 U.S. 501, 510 (1984)]." *Boston Herald, Inc.* v. *Superior Court Dep't of the Trial Court, supra* at 505-506. We adhere to the "general principle of publicity." *Ottaway Newspaper, Inc.* v. *Appeals Court,* 372 Mass. 539, 546 (1977), quoting *Commonwealth* v. *Blondin,* 324 Mass. 564, 571 (1949), cert. denied, 339 U.S. 984 (1950).

"Closure may occur if the following four requirements are met: '[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] [the judge] must consider reasonable alternatives to closing the proceeding, and [4] *[the judge] must make findings adequate to support the closure.' Commonwealth* v. *Martin,* 417 Mass. 187, 194 (1994), quoting *Waller* v. *Georgia,* 467 U.S. 39, 48 (1984). *Further, the findings must be particularized and supported by the record. Commonwealth* v. *Martin, supra* at 195. Accord *[Press-Enterprise Co.* v. *Superior Court,* 478 U.S. 1, 13-14 (1986)]; *United States* v. *Cojab,* 996 F.2d 1404, 1408 (2d Cir. 1993)." (Emphasis added.) (Footnotes omitted.) *Boston Herald, Inc.* v. *Superior Court Dep't of the Trial Court, supra* at 506.

In his written findings and order, the motion judge took "judicial notice of the extensive and emotional coverage given to the case by the media in general and the electronic media in particular." The motion judge concluded that "the presence of electronic media in the courtroom during the receipt of testimony in the trial of this case will create a substantial likelihood of a harmful consequence [because] the order of sequestration of the witnesses in this case is without meaningful application unless the electronic media is excluded from the courtroom during the reception of evidence."

In reviewing the motion judge's ruling, the single justice noted that it is common practice to order the sequestration of witnesses in a complex criminal trial. By itself, the fact that

witnesses are sequestered does not create a substantial likelihood that the defendant will be prejudiced by the presence of the media in the court room. See *Commonwealth* v. *Bianco*, 388 Mass. 358, 370, *S.C.*, 390 Mass. 254 (1983), and cases cited. Also, as the single justice observed, because only the electronic broadcasting and recording of the trial were prohibited, "[w]itnesses [would] have the opportunity, if they wish[ed], to violate the sequestration order, to learn of actual testimony from diffuse media reports and from many other sources."

The single justice also correctly determined that the judge's findings were insufficient to support his decision to limit the media's access. The motion judge himself admitted that the defendant was "unable to support, by affidavit, the importance of strict enforcement of the sequestration order of witnesses, without divulging his theory of defense." Without adequate factual support, a motion to limit media presence at a trial must fail. See *Boston Herald, Inc.* v. *Superior Court Dep't of the Trial Court*, *supra* at 505-506. For these reasons, we conclude that the order of the single justice was neither "clear error of law [n]or abuse of discretion. *Palaza* v. *Superior Court*, 393 Mass. 1001, 1002 (1984). *Schipani* v. *Commonwealth*, 382 Mass. 685 (1980)." *Fogarty* v. *Commonwealth*, 406 Mass. 103, 106 (1989).

The defendant claims, as well, that, because of the presence of the electronic media in the court room, his trial was unfair. In support of this claim, the defendant argues that (1) "at least one witness testified that he had seen news coverage of the case on television"; (2) the camera "inhibited communication between the defendant and counsel"; and (3) the camera "prevented defense counsel from seeing exhibits." The record does not support the defendant's claim that he was prejudiced because of the presence of the electronic media.

The witness referred to by the defendant, an emergency medical technician, stated that the only report he saw on television was that "the trial was pending." Defense counsel did complain about the camera's focusing on her communications with her client and blocking her access to exhibits. The record reflects that the judge immediately responded to these complaints. He ordered the camera operator to refrain from pointing the camera toward the defendant and the defendant's counsel, on penalty of being ejected from the court room. As to defense counsel's ability to see the exhibits, the judge told defense counsel that he

would address the problem at the next break in the proceedings. Defense counsel, a zealous advocate for her client throughout the trial, did not renew either complaint, indicating that the judge's response resolved the problems. We conclude that the presence of the electronic media in the court room did not impair the fairness of the defendant's trial.

C. *Sequestration of the jurors.* The defendant claims that, because of the extensive publicity, the judge erred in denying his motions to sequester the jurors. The defendant also argues that the judge erred because three jurors, two of whom were dismissed, reported exposure to comments about the case during the trial.

"The decision whether to sequester a jury lies within the sound discretion of the trial judge." *Commonwealth* v. *Cordle*, 412 Mass. 172, 179 (1992), and sources cited. The judge gave the jurors careful instructions on avoiding news reports and conversations with friends and family members about the case. The judge was entitled to assume that the jurors would heed his instructions. See *Commonwealth* v. *Rosa*, 422 Mass. 18, 29 (1996).

The defendant also argues that, because three jurors reported exposure to comments about the case outside the trial, we should conclude that the judge's decision not to sequester the jury was in error. That jurors were exposed to extraneous influences that resulted in their dismissal does not mean the judge's initial decision not to sequester the jury was an abuse of discretion or an error of law. See *Commonwealth* v. *Cordle, supra.* In this case, none of the jurors who reported exposure to extraneous influences reported exposure to the trial publicity of which the defendant complains. One juror was stopped for speeding on his way to the court house by a State trooper who was a witness in the case. The trooper escorted the juror to the court room. When the judge learned that the trooper involved was a witness in the case, he dismissed the juror.

A second juror was discharged during the presentation of the Commonwealth's case because her sister-in-law asked her on what case she was seated. Although she had been instructed not to answer such questions, the juror answered her sister-in-law and learned that her husband had gone to school with the defendant. The juror was concerned that the defendant might remember her husband's name and threaten her safety, and the judge dismissed her.

The third juror, who was not excused, was waiting for a ride home when she overheard the prosecutor telling a reporter that "the evidence was reliable" as the prosecutor passed. The juror had forgotten about the statement until, two or three days later, the judge reminded the jurors to inform him if they heard anything about the case outside of the court room. The juror informed the judge of the encounter, telling the judge that she had since arranged to be picked up in a different location so that she would not wait in the same doorway that the attorneys used. The juror indicated that she had not thought about the comment. The judge was entitled to take the juror at her word. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 551 (1990), and cases cited. See *Commonwealth* v. *James*, 424 Mass. 770, 777 (1997), quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 368 (1983).

D. *Motion to suppress.* (i) *Voluntariness of the defendant's statement to Officer Frost.* Officer Frost, of the Kingston police department, was one of the first police officers to arrive at the scene. He assisted Trooper Chicoine with handcuffing the defendant and then remained with the defendant when Trooper Chicoine went to check on Trooper Charbonnier. According to Officer Frost's testimony, the defendant's eyes were open. Officer Frost asked "if there was anybody else with him." The defendant replied, "Nobody's with me. I'm by myself." Officer Frost then told the defendant "not to lie." The defendant again stated "that he was by himself." Later, other officers questioned the defendant.

The defendant filed a pretrial motion to suppress the defendant's statements to Officer Frost and to other law enforcement personnel, arguing that the statements arose from a custodial interrogation by the police and that the police had not advised him of the Miranda warnings. See *Commonwealth* v. *Haas*, 373 Mass. 545, 552 (1977), S.C., 398 Mass. 806 (1986), quoting *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). The defendant also argued he had been shot in the head, and therefore he was not sufficiently aware of what was happening to give a voluntary statement.[5]

The judge denied the defendant's motion with respect to the

_____

[5]It could be argued that the defendant's statement is not, by itself, inculpatory. However, because the jurors knew that the defendant was on trial for murder and might well have understood the statement to be inculpatory, we shall treat it as such.

statement made to Officer Frost but suppressed evidence of the defendant's other statements. The judge also found that the defendant was capable of making a voluntary statement to Officer Frost.

We address first the claim that the judge erred in determining that the defendant's statement was made voluntarily.[6] "In reviewing a trial judge's determination that a voluntary waiver was made, the judge's subsidiary findings will not be disturbed, if they are warranted by the evidence, and his resolution of conflicting testimony will be accepted." *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982), quoting *Commonwealth* v. *Santo*, 375 Mass. 299, 303 (1978). "Not only must a trial judge conclude that a confession was freely and voluntarily given before he allows the jury to hear it, but his 'conclusion that the confession is voluntary must appear from the record with unmistakable clarity.' " *Commonwealth* v. *Brady*, 380 Mass. 44, 48 (1980), quoting *Sims* v. *Georgia*, 385 U.S. 538, 544 (1967).

The judge's findings of fact in his denial of the defendant's motions were supported by the evidence. The judge found that (1) the defendant's eyes were open when Officer Frost spoke with him; (2) the defendant was cognizant enough to volunteer that he had been shot and needed help; (3) at approximately 3:30 A.M., moments after the defendant's statement to Officer Frost, an emergency medical technician performed an assessment of the defendant's mental status, and "the defendant responded appropriately to the questions put to him by the EMT concerning his medical condition and was alert"; (4) on the ride to the hospital, the defendant remained "alert and oriented, circulation was fine and he appropriately answered all questions put to him during the examination"; and (5) "[t]he defendant, as part of the emergency procedure was asked a number of

[6]The defendant contends that his trial counsel was ineffective because she did not bring to the judge's attention the fact that the judge failed to instruct the jurors that, before considering the statement, they must be convinced that it was voluntary. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982); *Commonwealth* v. *Brady*, 380 Mass. 44, 49 (1980) ("Massachusetts practice dictates that a judge make a ruling on the voluntariness of the confession and instruct a jury that they may reconsider the issue of voluntariness should the confession be admitted"). However, this did not create a substantial likelihood of a miscarriage of justice. We are "confident that if the error had not been made, the jury verdict would have been the same." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).

questions to test his cognitive abilities, his state of conscious-
ness, and the depth of his injuries. He responded appropriately
to questions asking . . . his social security number, his date of
birth, his name, telephone number, address, and his marital
status."

These findings support the judge's determination that the
defendant was aware of what was happening and that the
defendant's statement was voluntary. The conclusion that the
statement was voluntary appears "from the record with
unmistakable clarity." *Commonwealth* v. *Brady, supra* at 48,
quoting *Sims* v. *Georgia, supra* at 544. There was no error.

(ii) *Miranda warnings.* We turn next to the defendant's claim
that the statement should not have been admitted because the
defendant had not been advised of the Miranda warnings.[7] The
general rule is that "Miranda warnings must precede police
questioning whenever [a] person is 'deprived of his freedom of
action in any significant way.' " *Commonwealth* v. *Haas, supra*
at 552, quoting *Miranda* v. *Arizona, supra* at 444. However, the
United States Supreme Court has held that there are circum-
stances in which "concern for public safety must be paramount
to adherence to the literal language of the prophylactic rules
enunciated in *Miranda.*" *New York* v. *Quarles,* 467 U.S. 649,
653 (1984). See *Commonwealth* v. *Bourgeois,* 404 Mass. 61,
65-66 (1989). The motion judge, basing his decision on the
reasoning in *New York* v. *Quarles, supra,* explicitly found that
the questions posed by Officer Frost were "[o]ut of concern for
public safety," and that, therefore, the responses to those ques-
tions were admissible despite the lack of Miranda warnings.

The judge's decision to admit the statement was correct. Of-
ficer Frost was one of the first police officers on the scene. He
was the first officer to question the defendant. His knowledge
was limited to the fact that a State trooper and a civilian had
been seriously wounded. His two questions served to discover
whether there were other individuals nearby who might pose a
risk to public safety. He did not ask whether the defendant had

---

[7]The Commonwealth argues that the interrogation by Officer Frost was not
a custodial interrogation. The judge assumed that the two questions put to the
defendant by Officer Frost constituted a custodial interrogation. In reviewing
the defendant's conviction, we do ."not disregard the theory of law on which
the parties proceeded at trial." *Commonwealth* v. *Monteagudo,* 427 Mass. 484,
487 (1998), quoting *Commonwealth* v. *Thompson,* 382 Mass. 379, 382 (1981).
We therefore do not discuss the Commonwealth's claim that Officer Frost's
interrogation was not a custodial interrogation.

shot Trooper Charbonnier. The shooting took place on an embankment near a residential neighborhood and civilians from the neighborhood had begun to gather near the scene. A weapon had not yet been found. In these circumstances, Officer Frost "needed an answer to his question not simply to make his case against [the defendant] but to insure that further danger to the public did not result." *New York* v. *Quarles, supra* at 657. The admission of the defendant's response to Officer Frost was not error.

The defendant next urges us to limit the application of *Quarles* to those cases in which there is "a grave threat to public safety, and not just a speculative threat to an individual police officer." We left that possibility open in *Commonwealth* v. *Bourgeois, supra.* The facts before us do not require that we reach the issue now either. At the time Officer Frost questioned the defendant, it was dark. It was not known whether there was an armed assailant in the vicinity of a residential neighborhood or perhaps nearby on the adjacent major highway. In these circumstances, we are satisfied that the risk to the public was as significant as it was in *New York* v. *Quarles, supra.*

(iii) *Verbal completeness.* The defendant asserts that the judge erred in not admitting the portion of his statements made to other police officers and medical technicians in which he stated that he had picked up two hitchhikers that evening. He argues that, under the doctrine of verbal completeness, the judge should have allowed him to introduce that portion of his other statements in evidence. We do not agree.

The doctrine of verbal completeness "allows admission of other relevant portions of *the same statement* or writing which serve to 'clarify the context' of the admitted portion. . . . The rule prevents a party from presenting a fragmented and misleading version of events . . . ." (Emphasis added.) *Commonwealth* v. *Carmona,* 428 Mass. 268, 272 (1998), quoting *Commonwealth* v. *Robles,* 423 Mass. 62, 69 (1996). The rule applies when the defendant's statement is (1) on the same subject as the admitted statement; (2) part of *the same conversation as the admitted statement;* and (3) necessary to the understanding of the admitted statement. See *Commonwealth* v. *Carmona, supra; Commonwealth* v. *Watson,* 377 Mass. 814, 826-827 (1979), *S.C.,* 409 Mass. 110 (1991). Here, the defendant sought to admit statements that were not part of the limited conversation with Officer Frost. Further, the later statements were not necessary to

provide the trier of fact with the context in which the conversation with Officer Frost took place.[8] The defendant successfully suppressed those statements that contained references to hitchhikers and therefore the doctrine of verbal completeness was inapplicable.

(iv) *The defendant's left-handedness.* The defendant filed a pretrial motion to suppress evidence that he told two police officers that he was left-handed. After making detailed findings of fact, which are supported by the record, the motion judge denied the defendant's motion. The defendant argues that the motion should have been granted because his statement that he was left-handed was made after he had invoked his right to an attorney. We conclude that the defendant's statement was not made in response to a police interrogation, which is the setting Miranda warnings are intended to safeguard. See *Commonwealth* v. *Torres*, 424 Mass. 792, 796 (1997). Therefore, there was no error.

We recite the relevant facts found by the motion judge. After the shooting, two officers went to the hospital to speak with the defendant. The officers read the Miranda warnings to the defendant. After the defendant indicated that he did not understand, the officers repeated the warnings. The defendant then stated that he understood the warnings. The defendant answered some general questions, but then indicated that he wanted a lawyer. The questioning ceased.

The officers asked the defendant to sign the waiver of rights form that they had read to him at the outset of the interview. The defendant said "he would except he was left handed and could not sign due to the condition of his left arm." The defendant maintains that this statement should have been excluded.

When the defendant invoked his right to have an attorney

---

[8]Recently, we affirmed the limited nature of the verbal completeness rule. "Under the 'limited' verbal completeness rule applied in this Commonwealth, 'whenever the statements, declarations or admissions of a party are made subjects of proof, all that was said by him *at the same time* and upon the same subject is admissible in his favor, and the whole should be taken and considered together.'. . . However, '[t]he defendant cannot compel the admission of an entire statement [] simply because the Commonwealth offers a part of it. Rather, it is necessary that the portion of the statement that the defendant seeks to introduce qualify or explain the segment introduced by the Commonwealth.' " (Emphasis added.) (Citations omitted.) *Commonwealth* v. *Leftwich*, 430 Mass. 865, 871-872 (2000).

present, the officers ceased the interrogation. They then turned to administrative matters, such as obtaining the defendant's signature on a form acknowledging that the defendant had, in answering the general questions about what happened earlier during the day of the murder, waived the rights protected by the Miranda warnings.

The facts in this case are analogous to those in *Commonwealth* v. *Diaz*, 422 Mass. 269, 271 (1996). In *Commonwealth* v. *Diaz*, the defendant was fingerprinted as part of routine booking procedures. *Id.* The defendant exclaimed, "This is really going to fuck me up," and the detective who was fingerprinting the defendant asked, "Why?" *Id.* The defendant then admitted that he had handled one of the guns used in a murder. *Id.*

We held that the defendant's inculpatory response was admissible because "the defendant's statements were not the product of a custodial interrogation conducted in violation of rights which Miranda warnings were designed to protect. . . . The detective's response, a one-word question, seems to have been a natural reflex action . . . . Although the second statement was incriminatory, it was volunteered and not the product of improper probing questioning." *Id.*

Similarly, the defendant's statement that he was left-handed was made in response to an administrative request by the police as part of their routine procedures. The statement was "not the product of improper probing questioning." See *id.* It was a spontaneous utterance in response to an appropriate procedural request. See *id.* The judge did not err in allowing testimony as to the defendant's statement that he was left-handed.[9]

3. *Conduct of the trial.* A. *The view.* The defendant claims

---

[9]Our decision is consistent with the principle that statements protected by the Miranda warnings are those that are the product of being both in custody and subjected to interrogation. *Commonwealth* v. *Torres*, 424 Mass. 792, 796 (1977). "The procedural safeguards of *Miranda* are required not where a suspect is merely in police custody, but rather where a suspect is subjected to custodial interrogation. [*Rhode Island* v. *Innis*, 446 U.S. 291, 300 (1980).] Interrogation 'must reflect a measure of compulsion above and beyond that inherent in custody itself,' and therefore Miranda warnings are only required when 'a person in custody is subjected to either express questioning or its functional equivalent.' *Id.* at 300-301. The term 'functional equivalent' includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' *Id.* at 301. *Arizona* v. *Mauro*, 481 U.S. 520, 526-527 (1987). . . . 'The "functional

that the judge erred in allowing the Commonwealth's request for a view of the murder site. The defendant argues that the view was prejudicial and inflammatory because road construction had altered the site and because a memorial to Trooper Charbonnier had been erected at the site.

"It is well within the discretion of a trial judge whether to allow a jury the opportunity to view the scene of an alleged crime." *Commonwealth* v. *Cataldo*, 423 Mass. 318, 327 n.8 (1996), citing G. L. c. 234, § 35 (1994 ed.); *Commonwealth* v. *King*, 391 Mass. 691, 694 (1984); *Commonwealth* v. *Curry*, 368 Mass. 195, 198 (1975). The record indicates that the judge carefully considered his decision to allow the view. The judge visited the site with the prosecuting attorney and defense counsel prior to deciding whether to permit the jurors to view the site. The judge also considered the impact that the memorial might have and had it covered with a cloth before the jurors arrived.[10] The judge did not abuse his discretion in allowing the view.

B. *Jury voir dire*. The defendant argues that the judge should have excused five jurors who, according to the defendant's brief, "had visited the roadside memorial for [Trooper Charbonnier]." The defendant also claims that the judge erred in failing to excuse a number of jurors for cause. See G. L. c. 234, § 28. We disagree.

Again, this is a matter within the sound discretion of the trial judge. *Commonwealth* v. *Federici*, 427 Mass. 740, 747 (1998). *Commonwealth* v. *Samuel*, 398 Mass. 93, 96 (1986). G. L. c. 234, §§ 26B, 28. "Juror bias is a question of fact to be determined by the judge. A finding that a juror is impartial will not be overturned on appeal unless the defendant makes a clear showing of abuse of discretion or that the finding was clearly erroneous." *Commonwealth* v. *Emerson*, 430 Mass. 378, 384 (1999), cert. denied, 529 U.S. 1030 (2000). In making a determination of juror bias, "[t]he judge is entitled to accept declarations of the jurors of their own disinterest." *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 551 (1990), and

_____

equivalence" test does not turn on the subjective intent of the particular police officer but on an objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances.' *United States* v. *Taylor*, 985 F.2d 3, 7 (1st Cir.), cert. denied, 508 U.S. 944 (1993)." *Commonwealth* v. *Torres, supra* at 796-797.

[10] We also note that defense counsel introduced an aerial photograph of the site and pointed out the memorial to the jurors.

cases cited. See *Commonwealth* v. *James,* 424 Mass. 770, 777 (1997), quoting *Commonwealth* v. *Bianco,* 388 Mass. 358, 368 (1983).

The defendant's claim that the five members of the venire might have been influenced by visiting the memorial is not supported by the record. One juror was excused because she told the judge that, after hearing some comments at work, she could not remain impartial. A second juror stated that his wife had run out to the memorial while he and his wife were stopped in traffic. The three remaining jurors cited by the defendant did not visit the memorial. The four unexcused jurors assured the judge that they could be impartial, and the judge properly exercised his discretion in declining to excuse them for cause. See *Commonwealth* v. *Federici, supra* at 747. The defendant has not made a showing that there was a substantial risk that any of these jurors were affected by an extraneous influence, and therefore this claim fails. *Commonwealth* v. *Seguin,* 421 Mass. 243, 247 (1995), cert. denied, 516 U.S. 1180 (1996).[11]

The defendant also complains that the judge did not respond appropriately to defense counsel's challenges and requests for further inquiry with respect to thirteen potential jurors. According to the defendant, "[w]here a well-founded inquiry of the jurors is denied, it should be assumed that the jurors were exposed to the information [that would have been the subject of the inquiry]." See *Commonwealth* v. *Crehan,* 345 Mass. 609, 613 (1963). The *Crehan* case cited by the defendant is distinguishable from the instant case. There, newspaper reporters published suppressed evidence in violation of a judge's explicit instructions. *Id.* at 612. In addition, the judge had "plan[ned]," at the outset of the trial, to instruct the jurors to disregard newspaper accounts. *Id.* at 611. Further, the judge never inquired of the jurors whether they were aware of, or had been influenced by, the articles. *Id.* at 613. Thus, we "assume[d] that they had read the articles." *Id.*

In the instant case, however, the judge questioned each juror individually as to whether he or she had been influenced by extraneous sources. Only the jurors who stated explicitly that

---

[11]The defendant asserts that most of the jurors were prejudiced by the news reports concerning Trooper Charbonnier's character, and therefore the jurors could not be impartial. The judge accepted their sworn statements. There is nothing in the record that indicates that the judge erred in his determination that, after voir dire, the jurors were indifferent. See *infra* at 19.

they could be impartial were declared to be indifferent. As we noted, *supra*, the judge excused a number of jurors whose answers displayed prejudice. The judge also responded appropriately to defense counsel's suggestions as to how best to question the jurors. See *Commonwealth* v. *James, supra* at 776-777 & n.14.

In these circumstances, "[w]e conclude that the judge acted properly, within his discretion, in refusing to excuse the juror[s] for cause. 'Where, as here, the judge who had the opportunity to observe the prospective juror[s], makes a determination that the juror[s] [are] indifferent after exploring the grounds for a possible claim that the juror[s] [were] not impartial, we cannot conclude, in the absence of any affirmative evidence to the contrary, that the judge abused his discretion.' " *Commonwealth* v. *Ascolillo*, 405 Mass. 456, 461 (1989), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 83 (1978).[12]

The defendant next complains that the judge failed to make sufficient inquiry of three of the deliberating jurors. We do not agree. Although each of the three deliberating jurors knew some facts of the case from experiences outside the court room, each assured the judge that he or she could be fair and impartial and decide the case on the evidence presented in court. The judge did make some further inquiry of each of them at defense counsel's request. The judge did not err in declining to ask every question suggested by defense counsel. The extent of further inquiry of a potential juror is within the trial judge's discretion. The answers given by these potential jurors showed them to be honest, bright, and articulate. The record supports the judge's determination to declare these three jurors indifferent.

C. *Evidence of defendant's parole status.* The defendant contends that it was error to admit evidence of his parole status. The Commonwealth submitted a motion in limine seeking admission in evidence of the defendant's parole status at the

---

[12]Because we conclude that the judge did not err in declining to inquire further or to excuse jurors for cause, we reject the defendant's claim that he was forced improperly to exhaust his peremptory challenges. See generally *Commonwealth* v. *Susi*, 394 Mass. 784, 786 (1985) (where defendant has been forced improperly to use and exhaust peremptory challenges, he need not show actual prejudice).

time of the murder.[13]

The trial judge denied the Commonwealth's motion, determining that the probative value of evidence of the defendant's status as a paroled "convicted manslaughterer" did not outweigh the risk of prejudice in presenting such evidence to the jurors. The Commonwealth appealed to a single justice of this court pursuant to G. L. c. 211, § 3. The single justice ordered "that the evidence of the defendant's parole status, *without reference to the underlying crime,* be admitted" (emphasis in original). The defendant claims that the decision of the single justice was in error and that the admission of the contested evidence was prejudicial. We disagree.

" 'In Massachusetts, evidence of other criminal behavior may not be admitted to prove the propensity of the accused to commit the indicted offense . . . .' *Commonwealth* v. *Martino,* 412 Mass. 267, 280 (1992), quoting *Commonwealth* v. *Gallison,* 383 Mass. 659, 672 (1981)." *Commonwealth* v. *Brousseau,* 421 Mass. 647, 650 (1996). "However, '[r]elevant evidence is not rendered inadmissible merely because it indicates that the defendant may have committed an offense other than that for which [he] is being tried.'. . . [If] the challenged evidence is admissible for a purpose other than impugning the defendant's character . . . [it is] admissible, so long as its probative value is not substantially outweighed by any prejudice . . . ." *Id.,* quoting *Commonwealth* v. *Robertson,* 408 Mass. 747, 750 (1990).

The probative value of the evidence was significant: "[w]ithout the challenged evidence [the murder] could have appeared to the jury as an essentially inexplicable act of violence." *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 269 (1982). The limitation that the single justice placed on the scope of the evidence, coupled with the judge's instructions to the jury on the proper use of the information,[14] minimized the prejudicial effect of the evidence. The decision of the single justice was

---

[13]The Commonwealth sought to suggest to the jurors that the defendant's motive in shooting Trooper Charbonnier was to avoid being found in violation of his parole and being sent back to prison.

[14]In his instructions, the judge told the jurors that "one particular piece of evidence . . . deals with the evidence concerning the parole status of the defendant. There was evidence that the defendant was on parole at the time of the events at issue. Now, that evidence was admitted for a limited purpose only, namely, as it may bear upon the question of whether the defendant had a motive to shoot Trooper Charbonnier. As with all evidence, the credibility and

neither a "clear error of law [n]or abuse of discretion. *Palaza* v. *Superior Court*, 393 Mass. 1001, 1002 (1984). *Schipani* v. *Commonwealth*, 382 Mass. 685 (1980)." *Fogarty* v. *Commonwealth*, 406 Mass. 103, 106 (1989). The evidence was properly admitted.

D. *Manslaughter instruction.* The defendant claims that the judge erred in failing to instruct the jurors on manslaughter. He suggests that, if the judge had instructed the jurors on manslaughter, the jurors might have concluded that the defendant fired accidentally. Alternatively, the defendant contends that he was entitled to a manslaughter instruction because he knew Trooper Charbonnier was wearing a bullet proof vest and therefore did not intend to kill Trooper Charbonnier. There was no error.

"A voluntary manslaughter instruction must be given 'if, on "any view of the evidence," regardless of the credibility, manslaughter may be found.' *Commonwealth* v. *Carrion*, 407 Mass. 263, 266 (1990), quoting *Commonwealth* v. *Pitts*, 403 Mass. 665, 667 (1989), and cases cited. See *Commonwealth* v. *Berry*, 431 Mass. 326, 335 (2000). The evidence must be viewed in the light most favorable to the defendant. See *Commonwealth* v.. *Pierce*, 419 Mass. 28, 31 (1994). An instruction need not be given if there is no evidence supporting a finding of manslaughter. See *Commonwealth* v. *Carrion, supra* at 267, and cases cited." *Commonwealth* v. *Emerson*, 430 Mass. 378, 382-383 (1999). Here, there was no evidence presented at trial supporting either of the defendant's theories, and therefore, no manslaughter instruction was warranted.

4. *Conclusion.* We conclude that the claims advanced by the defendant do not require a new trial. We also have reviewed the entire record pursuant to G. L. c. 278, § 33E, and conclude that

---

weight of it, and what inferences should be drawn from it are for you to decide. However, that evidence was not admitted to show that the defendant had a propensity, or an inclination, or a tendency to commit crime, or that he had or has a bad character. The defendant is on trial for the shooting of Mark Charbonnier. He is not on trial for any other crime. You may not consider the evidence of the defendant's parole status to conclude that if he committed some other act that eventually resulted in his parole status that he must have committed the offense for which he is now on trial. Nor can you conclude from this that he had a bad character. Again, you are to consider the evidence of [the] defendant's parole status only on the issue of motive."

the interests of justice do not require a new trial or the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*

Justice Lynch participated in the deliberation on this case, but retired before the opinion was issued.