Agnes, Peter W., J.
1. Introduction. The defendant, Ronny Genao, is charged by indictment with two counts of armed assault with intent to commit murder, and two counts of assault and battery by means of a dangerous weapon. The defendant has filed a motion to suppress statements he made to Trooper Sean Murphy of the Massachusetts State Police on September 6, 2009.
2. Findings of fact. There were no live witnesses who testified at the hearing on the defendant’s motion to suppress. Instead, the parties presented the court with the following exhibits: [1] CD recordings of four interviews by Trooper Sean Murphy with the defendant on September 6, 2009; [2] transcript of interview by Trooper Murphy with defendant on September 6, 2009 at 9:50 a.m.; [3] transcript of interview by Trooper Murphy with defendant on September 6, 2009 at 10:21 a.m.; [4] handwritten statement and Miranda card from interview by Trooper Murphy with defendant on September 6, 2009 at 4:03 p.m.; [5] U.Mass. Memorial Hospital “continuation” sheet; [6] U.Mass. Memorial Medical Center “Patient Discharge Care Form”; and [7] March 5, 2010 Grand Jury Testimony by Trooper Sean Murphy (pp. 26-37). The following findings of fact are based on an examination of the exhibits. The Court listened to each of the audio tapes as well.
3. First recorded interview. The incident in question took place between 4:30 a.m. and 5:00 a.m. on the morning of September 6, 2009. The defendant was shot at least two times in his leg and buttocks. He was taken to the emergency room of the University of Massachusetts Memorial Hospital. His wounds were treated and he was given medication to relieve the pain. Sometime prior to 9:50 a.m., State Police Trooper Sean Murphy gathered information about the incident.[1] By the time of the 9:50 a.m. interview, see exhibit 2, Trooper Murphy knew that the defendant and others were involved in an altercation of some type with other individuals as a result of which the defendant and two of his associates were shot. Trooper Murphy did not know that the defendant had used a weapon during the altercation, and did not suspect the defendant of criminal activity at the time. Trooper Murphy commenced the first recorded interview by asking the defendant to spell his last name and give his date of birth. Trooper Murphy acknowledged that the defendant was receiving pain medication, but then simply declares that the defendant’s thought processes are intact: “They gave you some meds. Doesn’t affect your ability to think? You can hear me okay, understand me fine?” After an inaudible response from the defendant, Trooper Murphy states, “No problem? Is that correct?” To which the defendant responds “yup.” See exhibit 2 at 2-3. The defendant *9 responded appropriately although his voice has a gutteral sound and his speech seems slurred at times. Trooper Murphy continues the brief interview by stating facts which appear to have come from an earlier interview to which the defendant responds “yup.” At one point, Trooper Murphy asks the defendant if he is still awake or falling asleep. After more facts about the incident are stated, the defendant responds “yes.” The defendant does respond beyond a simple “yes” or “no” when he is asked “how long did you stay in the bushes?” After an inaudible, the defendant’s response is “till the ambulance came.” Exhibit 2 at 5. Most of the defendant’s answers in the next portion of the interview are one word or only a few word responses. The defendant denies that he had a weapon. However, he becomes more conversant and is able to identify the women who were with him and to explain that his friend Alex was arrested for possession of a knife.
4. Second recorded interview. The second recorded interview occurs at 10:21 a.m. See exhibit 3. After only a few seconds, it is interrupted by a medical procedure. The interview resumes with the defendant being asked his name and date of birth. The defendant is able to correctly identify the day of the month. It is evident from the contents of this second recorded interview that Trooper Murphy had some conversation with the defendant either before the interview began or while the tape was turned off to allow for a medical procedure to be performed because Trooper Murphy makes reference to previously telling the defendant that one of his friends who was also involved in the incident under investigation had died, and to the defendant having mentioned to him that there was a machete at the scene. Exhibit 3, Tr. at 4. Trooper Murphy then proceeds to advise the defendant of his Miranda rights. The defendant responds that he understands his rights, and states that he wants to continue with the interview. Here, for the first time, the defendant speaks in a narrative form and describes the altercation. He states that he saw the unknown assailants holding their hands in such away that he feared they were holding firearms. The defendant said he retrieved a machete from the trunk of a car as one of the assailants began to beat his friend Nelson. Then, according to the defendant, the assailants began shooting. The defendant began to swing his machete. When asked if he hit anyone, he replied, “I really don’t know if I hit him.” The defendant also told Trooper Murphy that he was hit by a bullet and retreated across the street where he hid behind bushes. Shortly thereafter, the defendant said he might have hit someone with his machete. The interview concluded with the defendant agreeing to speak again to Trooper Murphy if requested to do so.
5. Third recorded interview. The third recorded interview of the defendant by Trooper Murphy took place in the same hospital emergency room shortly after 4:00 p.m.[2] The defendant was still taking pain medication for his gunshot wounds. The defendant acknowledged that he is aware that his brother has also died from injuries he suffered in the altercation that morning. Trooper Murphy once again informed the defendant of his Miranda rights. The defendant indicated he was aware of his rights and again agreed to speak to Trooper Murphy. During this interview, the defendant gave a more detailed account of the altercation, and for the first time stated that he “probably” hit someone with the machete. He added that he did not retrieve the machete until after he saw the assailants had guns. After the defendant gave his account of the events, Trooper Murphy told him he was going to prepare a written statement for the defendant to review and sign if accurate. This appears to have taken place. Questioning ceased while Trooper Murphy prepared a statement. The written statement was then handed to the defendant who was asked to read it and if accurate to sign it. The defendant agreed and signed the document. See exhibit 4.
6. Discussion. Affidavits filed by defendant As an initial matter, it is important to understand the evi-dentiary framework within which the defendant’s motion must be considered. Both the defendant and his counsel filed affidavits in support of the motion to suppress in which facts are recited that relate to the issues this court must decide, i.e., whether the defendant’s statements to the police were voluntary and whether the police complied with their obligations under the Miranda doctrine. While these affidavits are important to establish that voluntariness is alive issue in this case, they are not evidence for this court to consider in determining the motion to suppress. See Commonwealth v. Mubdi, 456 Mass. 385, 389 n.4 (2010) (defendant’s affidavit in support of motion to suppress is not a substitute for live testimony). With no opportunity to assess the credibility of the defendant who did not testify at the hearing on his motion to suppress, I decline to credit any of the statements contained in his affidavit.[3]
7. Voluntariness. The Commonwealth has the burden of proving beyond a reasonable doubt that the defendant’s statements were voluntary. A statement is voluntary if it is the product of a “rational intellect” and a “free will,” and not induced by physical or psychological coercion. See Commonwealth v. Selby, 420 Mass. 656, 662, 663 (1995), S.C., 426 Mass. 168 (1997); Commonwealth v. Davis, 403 Mass. 575, 581 (1988), S.C., 410 Mass. 680 (1991). In making this determination, the court must consider the totality of the circumstances. The factors include “whether promises or other inducements were made to [the </ defendant] by the police . . . [the defendant’s] age, educatiorf and intelligence . .. his experience with the criminal justice system . . . his physical and mental condition . . . whether he was under the influence of drugs or alcohol . . . and the details of the interrogation, including the recitation of Miranda warnings ...” *10 Selby, supra, 420 Mass. at 663 (citations omitted). A voluntary confession is one that in the totality of the circumstances is “the product of an essentially free and unconstrained choice by its maker.” Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).
8. There is no evidence of coercion by Trooper Murphy in his questioning of the defendant. Trooper Murphy did not physically abuse or threaten the defendant. He did not use any psychological tricks to persuade the defendant to speak. He did not deprive the defendant of medical care and treatment. In fact, at all times, the defendant was in the emergency room of U.Mass. Memorial Hospital and presumably receiving the appropriate medical care. The question presented in this case is whether the defendant’s statements were the product of a rational intellect and his free will notwithstanding his physical condition at the time including the recovery from gunshot wounds and the effects of pain medication. When a person has suffered a serious injury such as a gunshot wound, it does not lead automatically to the conclusion that statements made to the police thereafter were not voluntary. For example, in Commonwealth v. Clark, 432 Mass. 1 (2000), the Supreme Judicial Court held that the trial judge’s ruling that statements made by the victim of a gunshot wound to police officers while the victim was treated at the scene by the emergency medical technician were voluntary found support in the record.[4] Instead, the law is that a statement made by one who “by dint of physical or mental impediments is incapable of withholding the information conveyed” cannot be deemed voluntary. See Commonwealth v. Paszko, 391 Mass. 164, 177 (1984). In the present case, the record establishes that the defendant was awake and alert during the second and third interviews (at 10:21 a.m. and 4:09 p.m.). When, as in this case, a person has suffered a physical injury and has consumed drugs or received pain medication, in the absence of any evidence of coercion, the determination of voluntariness will turn on factors such as whether the defendant has any preexisting mental health problems, appears to be emotionally and physically stable at the time of the interview, the duration of the interview, whether the defendant complains about his level of pain and discomfort, whether the defendant’s speech was understandable, whether his answers indicate he was oriented to time, place and person, whether his answers were responsive to the questions asked of him, whether he responded without the need for questions to be repeated, whether his answers were in a narrative form or simple one-word answers to leading questions, and whether there are any other signs of fatigue, weakness, or confusion. See, e.g., Commonwealth v. Liptak, 80 Mass.App.Ct. 76 (2011),
9. Based on the contents of the first recorded interview with the defendant at 9:50 a.m. and the evidence of the circumstances in which it was conducted, the Commonwealth has not established beyond a reasonable doubt that the defendant’s statements were voluntary. I make this determination not because there is evidence of police coercion, but rather because there is insufficient evidence to establish beyond a reasonable doubt that the defendant intended by his one-word answers to adopt the statements contained in Trooper Murphy’s numerous leading questions. Additionally, Trooper Murphy’s statements to the effect that the pain medication administered to the defendant did not affect his ability to think is not a substitute for questions and answers that would demonstrate that the defendant was alert and oriented as to time, place, and person. At times during this interview, it appears that the defendant was falling asleep.
10. The second recorded interview at approximately 10:21 a.m. stands on a different footing from the earlier interview. The defendant gives coherent answers to the questions posed by Trooper Murphy that elaborate on the facts contained in the questions as opposed to one-word answers to leading questions. As soon as the defendant indicates he might have had a machete, Trooper Murphy stopped the interrogation and administered Miranda warnings. Up to this point, the record evidence suggests that the defendant was viewed by the police as a victim. The defendant’s responses to the Miranda warnings are appropriate, and there is no evidence that he did not understand what Trooper Murphy said. The defendant signed a Miranda waiver form. For the first time, the defendant’s answers add substance to the narrative described by Trooper Murphy. Although the defendant is still in the emergency room and still medicated, there is no indication that he was in pain, confused, or having any difficulty in processing the questions and formulating his answers. The defendant exhibited no signs of being under the influence of medication, or in distress as a result of his injuries. There is no evidence of police coercion during this interview. I find that in the totality of the circumstances, the statements made by the defendant during the second recorded interview are voluntary by a standard of proof beyond a reasonable doubt.
11. With regard to the third and final recorded interview shortly after 4:00 p.m., the record establishes that the defendant is alert and fully responsive based on his more detailed answers to questions posed by Trooper Murphy. The defendant exhibited no signs of being under the influence of medication, or in distress as a result of his injuries. There is no evidence of police coercion during this interview. I find that in the totality of the circumstances, the statements made by the defendant during the third recorded interview are voluntary by a standard of proof beyond a reasonable doubt.
ORDER
For the above reasons, the defendant’s motion to suppress is ALLOWED IN PART AND DENIED IN PART. The motion is ALLOWED as to the statement made to *11 Trooper Murphy at approximately 9:50 a.m. on the day in question. Otherwise, the motion is DENIED.

A transcript of this interview is not part of the record before me.

Likewise, I decline to credit the opinions expressed by defense counsel in his affidavit. It is the court’s responsibility to make its own independent assessment of the conduct of the police and the condition of the defendant from the primary source material submitted in evidence and marked as exhibits in this case.

In Clark, the Supreme Judicial Court noted that the trial judge found that “(1) the defendant’s eyes were open when Officer Frost spoke with him; (2) the defendant was cognizant enough to volunteer that he had been shot and needed help: (3) at approximately 3:30A.M., moments after the defendant’s statement to Officer Frost, an emergency medical technician performed an assessment of the defendant’s mental status, and ‘the defendant responded appropriately to the questions put to him by the EMT concerning his medical condition and was alert’; (4) on the ride to the hospital, the defendant remained ‘alert and oriented, circulation was fine and he appropriately answered all questions put to him during the examination’ and (5) ‘[t]he defendant, as part of the emergency procedure was asked a number of questions to test his cognitive abilities, his state of consciousness, and the depth of his injuries. He responded appropriately to questions asking . . . his social security number, his date of birth, his name, telephone number, address, and his marital status.” Clark, 432 Mass. at 12-13.

While there is no record of an interview of the defendant by Trooper Murphy, it appears that Trooper Murphy did question the defendant prior to 9:50 a.m. See exhibit two. The Commonwealth does not intend to offer the results of the pre-9:50 a.m. interview at trial, and the defendant does not address it in his motion to suppress.