COMMONWEALTH *vs.* CHRISTIAN KARL GERHARTSREITER.[1]

No. 10-P-1899.

Suffolk. June 1, 2012. - September 28, 2012.

Present: CYPHER, KAFKER, & GRAHAM, JJ.

*Parental Kidnapping. Assault and Battery by Means of a Dangerous Weapon. Assault and Battery. Name. False Impersonation & Identity Fraud. Fair Trial. Constitutional Law,* Impartial tribunal, Voluntariness of statement. *Evidence,* Expert opinion, Competency, Voluntariness of statement. *Practice, Criminal,* Fair trial, Venue, Competency to stand trial, Voluntariness of statement, Jury and jurors, Deliberation of jury, Argument by prosecutor. *Witness,* Expert. *Jury and Jurors.*

A Superior Court judge properly denied the criminal defendant's motion for a change of venue based on extensive pretrial publicity surrounding his case, where the size of the county in which the trial was held weighed against a finding of presumptive prejudice due to publicity, and there was no evidence presented suggesting that, due to the publicity, the defendant would be unlikely to succeed on his theory of defense; and where, in the totality of the circumstances, neither the publicity nor the venue deprived the defendant of his right to a fair trial, given that the judge, through a careful voir dire, was able, without inordinate difficulty, to empanel jurors who appeared to be impartial. [504-508]

At a criminal trial, the judge did not err in declining to strike the testimony of a clinical psychologist called by the Commonwealth as a rebuttal witness after the defendant presented two experts who testified that the defendant had a mental illness and, therefore, was not criminally responsible for the crimes alleged, where the rebuttal expert's error regarding the two prongs of criminal responsibility went to the merit, not the admissibility, of his opinion, and where the judge properly instructed the jury about the legal standard for determining lack of criminal responsibility. [508-510]

At a criminal trial, any error arising from the judge allowing the prosecutor to ask the defendant's experts whether the defendant was competent to stand trial was not prejudicial, where the judge's timely, clear instructions to the jury emphasized the difference between competency to stand trial and criminal responsibility and therefore cured any possible confusion in the minds of the jurors relating to that evidence. [510-511]

At a criminal trial, the judge did not err in admitting in evidence the portion of the defendant's videotaped interview while he was in custody prior to his invocation of his right to remain silent, where the judge, before concluding

---

[1]Also known as Clark Rockefeller.

that the defendant's statements were voluntary, held a voir dire, considered the testimony from experts for both the Commonwealth and the defense concerning the defendant's mental condition, and viewed the videotape; and where the judge was not required to accept the defense expert's testimony regarding the defendant's mental condition. [511-512]

The judge at a criminal trial did not abuse his discretion in allowing the jury to resume deliberations without inquiring whether certain extraneous material (a newspaper article) had reached the jury, where, prior to resuming their deliberations, the jurors confirmed that they had not been exposed to media reports about the case, and where there was no evidence that extraneous material had actually reached the jury. [512-513]

At a criminal trial, the prosecutor's remarks, in closing argument, regarding the defense of lack of criminal responsibility fairly commented on the inherent implausibility or unreliability of the defendant's claim of mental illness, i.e., that the defendant had fabricated the illness to escape the consequences of his actions; further, the prosecutor did not offer his personal opinion about the credibility of the defendant. [513-515]

At a criminal trial, the Commonwealth's evidence fairly could be deemed the type of wanton or reckless conduct resulting in harm to another that is the legal equivalent of intentional conduct for purposes of establishing assault and battery by means of a dangerous weapon; further, the judge's instruction on this charge correctly did not present fundamentally conflicting theories of liability. [515-516]

INDICTMENTS found and returned in the Superior Court Department on September 26, 2008.

The cases were tried before *Frank M. Gaziano*, J., and a motion to set aside the jury verdicts or for a new trial was heard by him.

*Jeffrey A. Denner* for the defendant.

*John P. Zanini*, Assistant District Attorney (*David A. Deakin*, Assistant District Attorney, with him) for the Commonwealth.

GRAHAM, J. The defendant, Christian Karl Gerhartsreiter, was indicted by a grand jury on September 26, 2008, and charged with parental kidnapping, in violation of G. L. c. 265, § 26A; assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15A; assault and battery, in violation of G. L. c. 265, § 13A; and furnishing a false name to a law enforcement officer, in violation of G. L. c. 268, § 34A. At trial, the defendant did not dispute that he committed the crime of parental kidnapping, but claimed that he was not criminally responsible. A Superior Court jury rejected the defendant's claim that he lacked criminal responsibility and convicted him of parental

kidnapping and assault and battery by means of a dangerous weapon, but acquitted him of the other charges.

After his convictions, the defendant filed a motion for an order setting aside the convictions or, in the alternative, granting him a new trial. See Mass.R.Crim.P. 25(b)(2), as amended, 420 Mass. 1502 (1995). The trial judge denied the motion, and the defendant filed a timely appeal.

On appeal, the defendant argues that his right to trial by a fair and impartial jury was violated by pretrial publicity; the judge improperly admitted testimony from the Commonwealth's psychiatric expert that was based on incorrect legal standards; the judge improperly permitted testimony by the Commonwealth's experts that the defendant was competent to stand trial, thereby confusing the jury on the issue of criminal responsibility versus competency to stand trial; the judge erred in concluding that certain of the defendant's statements to various law enforcement officers were voluntary; the prosecutor's closing argument contained improper remarks; and the evidence was insufficient to convict him of assault and battery by means of a dangerous weapon. We affirm.

1. *Background.* We recite the facts in the light most favorable to the Commonwealth. The defendant, under the name Clark Rockefeller, married Sandra Boss in 1995 in a ceremony held in Nantucket. From the start of the marriage, Boss was the primary income earner. The defendant and Boss lived in Nantucket for about six months and then moved to Cornish, New Hampshire. In May, 2001, the couple's daughter was born. For the first three months after the birth, Boss was the primary caregiver for her daughter, and then the defendant and Boss hired two nannies to care for the daughter until she turned two years old. Thereafter, the defendant assumed the duties of primary caregiver, and Boss continued her role as the primary income earner. In October, 2004, when the child was three and one-half years old, Boss transferred to work in Boston, and in 2006, the defendant and Boss bought a house in Boston.

Problems developed in the marriage, and in January of 2007, Boss formally separated from the defendant, moved out of the house, and filed for divorce. The parties agreed that the defendant would have child custody five days per week, and Boss two

days. However, during the ensuing year, the custody arrange-
ment shifted so that, by December of 2007, the child was spending
almost all her time with Boss. As part of the divorce proceed-
ings, Boss hired a private investigator and later filed documents
in the proceedings raising the question of the defendant's identity.
Shortly thereafter, the defendant and Boss agreed to a settle-
ment in which Boss would have full custody of the child and
move with her to London, and the defendant would have three
supervised visits per year, with eight hours per day to spend
with the daughter; $800,000; two cars; Boss's engagement ring;
and other personalty. Boss and the child moved to London in
December of 2007.

Arrangements were made for the defendant to see his daughter
on July 25 to 27, 2008, under the supervision of Howard Yaffe,
a social worker, who was to meet Boss and the child at the
Algonquin Club on Commonwealth Avenue in Boston and take
the child for the visit. On Saturday morning, July 26, 2008, Yaffe
took the child to visit with the defendant. Yaffe returned with her
at approximately 5 P.M. that day.

Meanwhile, the defendant had hired a livery car driver, Dar-
ryl Hopkins. Again using the name Clark Rockefeller, the defend-
ant told Hopkins that he was planning to go sailing in Rhode
Island with his daughter and the son of Rhode Island Senator
Lincoln Chaffee. He also told Hopkins that they had to escape
the company of a troublesome family friend, whom he described
as looking like Yaffe, and asked that Hopkins be prepared to do
what was necessary to help the defendant get away. Hopkins
agreed to help the defendant escape from Yaffe, and on Friday,
July 25, 2008, the defendant and Hopkins selected a spot on
Marlborough Street, Boston, for the pick-up. There, the defend-
ant rehearsed jumping into Hopkins's sport utility vehicle with
his daughter: he practiced tossing his full backpack into the
open door, jumping in, and shutting the door.

On the morning of Sunday, July 27, 2008, Yaffe again met
the defendant with the child for the scheduled visit. They went
to a park, where the defendant made a telephone call. Later,
while the three were walking down Marlborough Street, the
defendant pointed out a building undergoing construction. When
Yaffe turned to look, the defendant shoved him in the back. As

Yaffe stumbled forward, Hopkins drove to the defendant, and the defendant and the child entered the vehicle. Yaffe ran to the vehicle in an attempt to stop the defendant from leaving with his daughter and grabbed the open door. The defendant pulled the door closed and yelled, "Go! Go! Go!" Hopkins turned and saw Yaffe holding onto the vehicle, and then sped away. Yaffe continued holding onto the door and ran alongside the vehicle, but was eventually forced to let go and tumbled to the ground, suffering minor injuries. The defendant directed Hopkins to a convenience store on Revere Street, and left the vehicle, telling Hopkins to wait at the store while he took his daughter to Massachusetts General Hospital. The defendant then tossed an envelope containing $2,000 onto the front seat. He and his daughter entered a taxicab and left the city.

Approximately one week after the defendant abducted his daughter, he was apprehended, with his daughter, in Baltimore, Maryland, by agents from the Federal Bureau of Investigations (FBI). While the defendant was in their custody, he participated in a videotaped interview. During the interview, the defendant made several inculpatory statements.

Prior to trial, the defendant filed a motion to dismiss, which was denied; a motion to suppress portions of his recorded interview with FBI agents, which was allowed;[2] and a motion for change of venue, which was denied.

The defendant's case was tried in the Superior Court in Suffolk County from May 26 to June 8, 2009, with five days of jury deliberations thereafter. The defense argued that the defendant was not criminally responsible for the charge of parental kidnapping and, at the close of the Commonwealth's case, moved for a required finding of not guilty on the charge of assault and battery by means of a dangerous weapon. The motion was denied, and on June 12, 2009, the jury found the defendant guilty of both crimes.

2. *Impartial jury.* On April 3, 2009, the defendant filed a motion for change of venue based on extensive pretrial publicity

---

[2]The defendant's motion to suppress concerned certain portions of the videotaped interview. See part 5, *infra*. The motion judge, who was also the trial judge, determined that the FBI agents improperly continued questioning the defendant after he invoked his right to remain silent.

surrounding the case. The motion was accompanied by various articles published in the press regarding the allegations against the defendant and polling information. The defendant urged the judge to move the trial to Hampden County, where the poll indicated less exposure of the public to information about the case. The judge denied the motion in a written memorandum of decision primarily on the basis that the media coverage had been factual and not inflammatory; the survey did not demonstrate that the majority of people who lived in Suffolk County had formed an opinion about the defendant's guilt; there was not a statistically significant difference in the views of people in the two counties; and the defendant and his attorneys were, in part, responsible for portions of the media coverage by participating in interviews and holding news conferences. While the judge concluded that an impartial jury could be selected in Suffolk County, he denied the motion for change of venue without prejudice.

The selection of the jury was completed in two days and the selection process was unremarkable. Prior to jury selection, the venire were instructed not to discuss the case, read about it, conduct any research about the case via the Internet, or otherwise expose themselves to media coverage of the case.

A criminal defendant is guaranteed the right to a trial by an impartial jury. See *Commonwealth* v. *Susi*, 394 Mass. 784, 786 (1985); *Commonwealth* v. *Guisti*, 434 Mass. 245, 251 (2001). In reviewing a defendant's claim that his right to trial by an impartial jury was violated due to prejudicial pretrial publicity, we examine first whether a change of venue was required because the jury were presumptively prejudiced against him. See *Commonwealth* v. *Toolan*, 460 Mass. 452, 462-466 (2011). If the jury were not presumptively prejudiced, we then examine whether the defendant has shown actual prejudice. *Id.* at 466.

A trial judge may order a change of venue if "there exists in the community where the prosecution is pending so great a prejudice against the defendant that he may not there obtain a fair and impartial trial." Mass.R.Crim.P. 37(b)(1), 378 Mass. 914 (1979). A change of venue should be ordered only "with great caution and only after a solid foundation of fact has been first established." *Commonwealth* v. *Clark*, 432 Mass. 1, 6 (2000) (quotation omitted). A trial judge has substantial discre-

tion in deciding whether to allow a motion for a change of venue. *Commonwealth* v. *McCowen*, 458 Mass. 461, 475 (2010). "In evaluating the risk of prejudice posed by pretrial publicity, we give careful attention to the evaluation of the trial judge, especially one who, as here, presides in the county where the crime occurred and is familiar with the nature and pervasiveness of the pretrial publicity." *Id.* at 476.

"Prejudice against the defendant sufficient to preclude a fair and impartial trial may exist because the entire jury pool is tainted by exposure to pretrial publicity. In such circumstances, the venire is considered presumptively prejudiced, regardless of the details of the voir dire process, and even if individual members of the jury expressly assert their belief that they can be fair and impartial. However, presumptive prejudice exists only in truly extraordinary circumstances." *Toolan, supra* at 463 (citations and quotations omitted).

To assess whether pretrial publicity and the resulting local prejudice precludes a fair trial, we consider the following factors: the influence of the media, if any, on the trial; whether the jury acquitted the defendant of some of the charges; the size of the community; the length of time between the peak media coverage and the date of the trial; whether the judge was able to empanel jurors who appeared impartial; and whether the news stories contained a confession or "smoking gun" rather than merely being unkind portrayals of the defendant. *Id.* at 463-464. "[P]retrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial." *Nebraska Press Assn.* v. *Stuart*, 427 U.S. 539, 554 (1976).

The size of Suffolk County, with its substantial population base,[3] weighs against a finding of presumptive prejudice due to publicity. Portrayals of the defendant in the media emphasized his penchant for assuming the identity of a person who was rich and famous. Moreover, there was no evidence presented to the judge that suggested that the defendant was unlikely to succeed on his theory that he was not guilty by reason of lack of criminal responsibility, or that left the impression that the defendant bore

---

[3]According to one source, in July, 2009, the population of Suffolk County was 753,580. See http://www.city-data.com/county/Suffolk_County-MA.html (last viewed September 26, 2012).

the responsibility of proving his lack of criminal responsibility. In sum, here, while the defendant has shown the existence of substantial pretrial publicity surrounding the kidnapping that was somewhat sensational, the coverage focused primarily on the defendant's name change and apparent affectation of a upper-class lifestyle.[4] "These references, however, are 'significantly short of the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice.' " *Commonwealth* v. *Morales*, 440 Mass. 536, 540 (2003), quoting from *United States* v. *Angiulo*, 897 F.2d 1169, 1181 (1st. Cir.), cert. denied sub nom. *Granito* v. *United States*, 498 U.S. 845 (1990).

We turn, therefore, to whether, in the totality of the circumstances, the publicity and the particular venue at issue, Suffolk County, deprived the defendant of his right to a fair trial. The defendant argues that the difficulty in seating an impartial jury was confirmed by the voir dire, which, he claims, was insufficient to weed out and redress the prejudicial media exposure. During the empanelment, the defendant used all of his peremptory challenges to strike persons exposed to media coverage about the crime who had not been removed for cause. At the conclusion of the process, jurors remained seated who had been exposed to that coverage.

"It is not required . . . that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror

---

[4] Among the many stories about the defendant published prior to his trial were an August 6, 2008, local newspaper story, entitled "Mousy Mystery Man"; a September 12, 2008, Dateline NBC story, entitled "Famous Name, Infamous Life"; and a Vanity Fair magazine article, entitled "The Man in the Rockefeller Suit," which began with a detailed description of the alleged kidnapping. There was no evidence presented by the defense that potential jurors in Hampden County were less likely than those in Suffolk County to read Vanity Fair articles or view Dateline NBC stories.

We also note that in the cases cited by the defense, the defendants were charged with far more heinous crimes than those for which the defendant was indicted. The facts in those other cases were more likely to engender inflammatory or sensationalistic media coverage. See *Commonwealth* v. *Angiulo*, 415 Mass. 502 (1993) (accessory to murder); *Commonwealth* v. *Clark, supra* (murder); *Commonwealth* v. *Guisti*, 434 Mass. 245 (2001) (aggravated rape); *Commonwealth* v. *Morales*, 440 Mass. 536 (2003) (murder); *Commonwealth* v. *Leahy*, 445 Mass. 481 (2005) (murder); *Commonwealth* v. *McCowen, supra* (murder, aggravated rape).

can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin* v. *Dowd*, 366 U.S. 717, 722-723 (1961). The judge was required only to determine whether the jurors could exclude all matter not properly before them at trial, and decide the case fairly according to the facts presented and the instructions on the law given to them. See *Commonwealth* v. *Stroyny*, 435 Mass. 635, 639 (2002). Here, the judge, through a careful voir dire process, was able, without inordinate difficulty, to empanel jurors who appeared to be impartial. We have no reason to assume that those who expressed impartiality were misleading the judge or mistaken about their own ability to judge fairly. Only fourteen of fifty-four jurors (or twenty-five percent) were excused due to media coverage, significantly less than the thirty-five percent of jurors excused in *Clark*, 432 Mass. at 6. Finally, we note that the defendant did not renew his motion for change of venue at the completion of the empanelment process.[5]

3. *Challenge to testimony by the Commonwealth's rebuttal expert.* The defendant presented two experts, Dr. Catherine Howe, a psychologist, and Dr. Keith Ablow, a psychiatrist, author, and television commentator, regarding the issue of the defendant's criminal responsibility. Both witnesses testified that the defendant had a major mental illness, namely, a delusional disorder, and, therefore, was not criminally responsible for the crimes.

The Commonwealth's rebuttal witness was Dr. James Chu, a clinical psychiatrist with nearly thirty years of experience in psychiatry, and a specialist in dissociative disorders. For most of his career, he worked primarily as an administrator at McLean Hospital. Dr. Chu opined that the defendant did not suffer from a delusional disorder, a mental illness in which a person firmly holds false beliefs about external reality despite incontrovertible evidence to the contrary, but rather suffered from a mixed personality disorder (with narcissistic and antisocial traits).

The defendant contends that Dr. Chu's testimony was inadmissible because he misstated the legal standard for criminal responsibility, and was unaware of which party bore the burden

---

[5]We also note that the jury ultimately acquitted the defendant of two of the charges against him, indicating, to some extent, that they focused their attention on the evidence presented in the case and were not swayed by prejudice.

of proof on the issue of criminal responsibility. The legal standard for determining criminal responsibility, established in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), is familiar: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." In other words, under the *McHoul* standard, "[c]riminal conduct is excusable . . . only where the defendant's capacity to appreciate the criminality of his action or his capacity to conform his conduct to the requirements of law was substantially impaired as a result of a mental disease or defect." *Commonwealth* v. *Laliberty*, 373 Mass. 238, 241 (1977).

Dr. Chu stated, erroneously, on cross-examination that in order for the defendant to lack criminal responsibility, both prongs of the test had to be satisfied. Also on cross-examination, the defense elicited testimony that demonstrated that Dr. Chu did not know whether the Commonwealth or the defendant bore the burden of proof on the issue of criminal responsibility. The defendant, therefore, contends that the judge should have struck Dr. Chu's testimony. We disagree.

A qualified expert may provide expert testimony regarding the defendant's mental condition at the time of the crime without referring to the *McHoul* standard, and the jury may consider such evidence to assess criminal responsibility. *Commonwealth* v. *Amaral*, 389 Mass. 184, 193-194 (1983). "Testimony in purely medical or psychological terms may in many instances be preferable; the expert may be best equipped to use medical or psychological concepts, and the testimony may not fit neatly in legal categories." *Commonwealth* v. *Shelley*, 381 Mass. 340, 348 n.4 (1980).

Dr. Chu's error regarding the two prongs of criminal responsibility goes to the merit, not the admissibility, of his opinion. See *Commonwealth* v. *Sliech-Brodeur*, 457 Mass. 300, 327-328 (2010). Here, the judge properly instructed the jury about the legal standard for determining lack of criminal responsibility. In addition, after receiving the instructions, the jury asked for clarification on whether the Commonwealth had to prove both prongs, and was instructed by the judge specifically that the

Commonwealth had to prove that the defendant appreciated the wrongfulness of his conduct *and* possessed the ability to conform his conduct to the dictates of the law. Furthermore, the judge instructed the jury that they were the sole arbitrators of the facts relied upon by the opinion witnesses and of the credibility and weight of such testimony. Thus, the jury understood they could discredit Dr. Chu's opinion entirely, as the defendant suggested they should. See *Commonwealth* v. *Addy*, 79 Mass. App. Ct. 835, 839 (2011). There was no error.

4. *Testimony regarding the defendant's competency to stand trial.* During the trial, the judge allowed the prosecutor, over the defendant's objection, to ask the defendant's experts whether the defendant was competent to stand trial. The defendant argues that such testimony was erroneously allowed, and that the error was prejudicial because it confused the jury in their consideration of the question whether the defendant was criminally responsible. Whether a person is legally incompetent to stand trial and whether he is not guilty of the charged offense because of a lack of criminal responsibility are distinct questions, *Commonwealth* v. *DeWolfe*, 389 Mass. 120, 123 (1983), and at a trial where a defendant asserts lack of criminal responsibility, evidence of the defendant's competency can present "a potent source of confusion for the jury." *Ibid.* Competency is "sufficient present ability to consult with [one's] lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings." *Commonwealth* v. *Russin*, 420 Mass. 309, 317 (1995), quoting from *Dusky* v. *United States*, 362 U.S. 402, 402 (1960). "A person may be competent to stand trial and yet be quite insane for purposes of determining criminal responsibility." *Commonwealth* v. *Loring*, 14 Mass. App. Ct. 655, 660-661 (1982) (conflating terms "competence" and "insanity" in jury instructions was reversible error).

Here, the error, if any, was not prejudicial. The judge's clear instructions emphasized the difference between competency and criminal responsibility, and adequately cleared any confusion that may have resulted from the admission of the evidence of the defendant's competency. The judge clearly instructed the jury that competency was not equivalent to criminal responsibility, and properly reminded the jurors that they should "remain

focused on the defendant's mental state at the time of the alleged offenses and consider that mental state in accordance with the law relating to lack of criminal responsibility." The timely instruction therefore cured any possible confusion in the minds of the jurors relating to the evidence of the defendant's competency.

5. *The defendant's videotaped statements.* The defendant contends that the judge erred by admitting in evidence fourteen minutes of his videotaped interview while he was in the custody of the FBI. After fourteen minutes of questioning, the defendant invoked his right to remain silent, and the judge suppressed the remainder of the interview on this ground. The defendant argues that the first fourteen minutes of the interview should have been excluded under the "humane practice" rule, see *Commonwealth v. Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982), because the statements were the product of mental illness and, therefore, not voluntary. The Commonwealth bears the burden of establishing beyond a reasonable doubt that a defendant's statements were voluntary, *Commonwealth v. Edwards*, 420 Mass. 666, 669-670 (1995), and if the judge concludes that the defendant's statements were voluntary beyond a reasonable doubt, that conclusion "must appear from the record with unmistakable clarity." *Sims v. Georgia*, 385 U.S. 538, 544 (1967). "[T]he judge's decision as to the voluntariness of the defendant's statements involves a consideration of the defendant's mental condition," *Commonwealth v. Vazquez*, 387 Mass. 96, 99 (1982), and where lack of criminal responsibility is at issue, the judge must, initially, determine whether statements by a criminal defendant were "the product of a rational intellect as part of the issue of voluntariness." *Commonwealth v. Johnston*, 373 Mass. 21, 25 (1977). Statements attributable to a defendant whose "mental impediments [render him] incapable of withholding the information" are clearly involuntary. *Commonwealth v. Benoit*, 410 Mass. 506, 511 (1991), quoting from *Commonwealth v. Paszko*, 391 Mass. 164, 177 (1984). However, "[t]here is no per se rule against admitting statements of individuals with mental disorders." *Commonwealth v. Boyarsky*, 452 Mass. 700, 715 (2008).

Here, the judge held a voir dire, considered the testimony from experts for the Commonwealth and the defendant concerning the defendant's mental condition, and viewed the videotape

before concluding that the defendant's statements were voluntary. The defendant does not argue that the findings made by the judge in support of his conclusion are clearly erroneous; rather he contends, essentially, that the judge erred in crediting the Commonwealth's expert over the defendant's expert. However, the judge was not required to accept the defense's testimony regarding the defendant's mental condition. See *Commonwealth v. Carter*, 423 Mass. 506, 511 n.5 (1996) (judge who conducts a voir dire on the admissibility of statements for voluntariness determines the credibility of the witnesses). There was no error.

6. *Jury deliberations.* At the conclusion of the trial, the jury deliberated for five days prior to reaching verdicts in the case. On the third day of deliberations, the prosecutor brought to the judge's attention that at noon on that day a local television station had carried a report of the imminent indictment of the defendant in California for murder. With the agreement of the parties, the judge instructed the jury at the end of that day to be extra careful to avoid any media coverage of the case and to avoid receiving any information about the case, and reminded the jury that the case was to be decided solely on the evidence introduced at the trial. The following morning, before deliberations continued, the judge asked the jury, collectively, if they had followed his instruction to avoid media coverage of the case. All deliberating jurors confirmed that they had.

On the fifth day of deliberations, after the jurors confirmed they had not read or been exposed to media coverage about the case and were sent to the jury room to continue deliberation, the defendant's counsel informed the judge that a local newspaper had published an article that stated the defendant could possibly be indicted in California for murder. Defense counsel made no request that an inquiry be conducted of the jury. Later that morning, the jury reached their verdicts on all of the indictments.

The defendant argues that once defense counsel alerted the judge to the possibility that extraneous material may have reached the jury, the judge should have conducted an inquiry of the jury, particularly since the jury had been instructed to avoid coverage of the specific case on trial but not general media coverage of the defendant. Thus, he contends, the judge's failure to address this issue constituted an abuse of discretion. See *Commonwealth v. Fredette*, 56 Mass. App. Ct. 253, 259 n.10 (2002).

"When a judge determines that the jury may have been exposed during the course of trial to material that 'goes beyond the record and raises a serious question of possible prejudice,' he should conduct a voir dire of jurors[6] to ascertain the extent of their exposure to the extraneous material and to assess its prejudicial effect." *Commonwealth* v. *Francis*, 432 Mass. 353, 369-370 (2000), quoting from *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). Here, prior to resuming their deliberations, the jurors confirmed that they had not been exposed to media reports about the case. Moreover, there was no evidence that extraneous material had actually reached the jury, and the defendant did not seek any inquiry of the jury. We therefore conclude that the judge properly allowed the jury to resume deliberations without inquiry regarding the newspaper article.

7. *Prosecutor's closing argument.* The defendant faults the prosecutor for two alleged errors in his closing argument: belittling the defense of lack of criminal responsibility, thereby depriving the defendant of a legally recognized defense; and effectively offering his personal opinion that the use of the defense of lack of criminal responsibility in this case was simply the latest manipulation by the defendant. See *Commonwealth* v. *Kosilek*, 423 Mass. 449, 459 (1996) (prosecutor may not assert his or her personal opinion as to the credibility of witnesses or the guilt of the defendant). The prosecutor stated:

> "Don't let him get away with that. Don't let this insanity defense be the culminating manipulation in a lifetime of lies designed to get what he wanted. Don't shy away from the facts. See the truth before you. Hold the defendant criminally responsible for his actions. Find him guilty on each and every count with which he's charged."

The defendant made timely objections to the prosecutor's

---

[6]In conducting the voir dire for possible exposure of the jury during trial to extraneous material, "[t]he initial questioning concerning whether any juror saw or heard the potentially prejudicial material may be carried on collectively, but if any juror indicates that he or she has seen or heard the material, there must be individual questioning of that juror, outside of the presence of any other juror, to determine the extent of the juror's exposure to the material and its effects on the juror's ability to render an impartial verdict." *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978).

closing argument. Therefore, we review to determine whether the remarks were improper and, if so, whether the improper remarks prejudiced the defendant. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997). "Remarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992). We ask whether the improper remarks went to the heart of the defense, whether the judge gave curative instructions, and whether the improper argument influenced the jury. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 517-518 (1987).

Prosecutors are permitted to argue theories supported by the evidence and to suggest fair inferences from the evidence. *Commonwealth* v. *Christian*, 430 Mass. 552, 564-565 (2000). Viewed in context, the prosecutor's remarks would have been seen by a rational juror as directed not at the propriety of the insanity defense but as fairly commenting on the inherent implausibility or unreliability of the defendant's claim of mental illness, i.e., as a claim fabricated by the defendant to escape the consequences of his actions. Moreover, the prosecutor noted that the defendant had spent most of his adult life misleading his wife and others about important aspects of his background and identity. The defense of lack of criminal responsibility, the prosecutor argued, was just another attempt to lie and manipulate people, consistent with his past practices. The argument was not improper.

Nor is there any basis to the claim that the prosecutor argued, improperly, his personal belief about the credibility of the defendant. Clearly, a prosecutor may not express his or her personal opinion as to the guilt of a defendant or the credibility of a witness; however, the prosecutor is permitted to comment upon evidence developed at trial and may ask the jury to draw inferences from such evidence. See *Kosilek, supra.* Argument that properly focuses on the evidence, and that "falls into the category of 'enthusiastic rhetoric, strong advocacy, and excusable hyperbole,' . . . is not grounds for reversal." *Commonwealth* v. *Silva*, 455 Mass. 503, 515 (2009), quoting from *Commonwealth* v. *Wilson*, 427 Mass. 336, 350 (1998). The defendant does not contend that the prosecutor misstated the evidence. Rather, his objection appears to be focused on the prosecutor's rhetoric and

strong advocacy. This argument lacks merit because "the jury are presumed to know 'that the prosecutor is an advocate' and to be able to recognize his arguments as advocacy." *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998), quoting from *Commonwealth* v. *Coleman*, 366 Mass. 705, 714 (1975).

8. *Challenge to conviction of assault and battery by means of a dangerous weapon.* The defendant argues that the judge erred in denying his motion for a required finding of not guilty on the charge of assault and battery by means of a dangerous weapon because the evidence was insufficient to support that charge. The defendant argues, essentially, that Hopkins's testimony should be read as demonstrating that Hopkins acted on his own and that the defendant was unaware that there was a substantial likelihood that Hopkins's actions would dislodge Yaffe from the vehicle. Thus, he claims, even taking the facts in the light most favorable to the Commonwealth, the evidence is insufficient to sustain a conviction on the charge either as a principal or as an accomplice.

The evidence, in the light most favorable to the Commonwealth, was that the defendant hired Hopkins to help engineer a secret scheme to kidnap his daughter, and that after ushering his daughter into Hopkins's vehicle, with Yaffe holding onto the door, the defendant ordered Hopkins to accelerate the vehicle, thereby dislodging Yaffe and causing him to suffer injuries. The Commonwealth's evidence thus could be fairly deemed the type of wanton or reckless conduct resulting in harm to another that is the legal equivalent of intentional conduct for purposes of establishing assault and battery by means of a dangerous weapon. See *Commonwealth* v. *Welch*, 16 Mass. App. Ct. 271, 273-275 (1983).

Finally, we reject the defendant's argument that the judge's instructions on the charge of assault and battery by means of a dangerous weapon presented fundamentally conflicting theories of liability, thereby violating his right to due process of law. The judge instructed the jury, in part, that the defendant acted recklessly

> "if he knew or should have known that such actions were very likely to cause substantial harm to someone but he

ran that risk and went ahead anyway. But it's not necessary that he intended to injure or strike the alleged victim or that he foresaw the harm that resulted."

The judge further instructed the jury on the elements of joint venture.[7] The instruction conveyed to the jury that if Hopkins acted in reckless disregard of the substantial risk to Yaffe, and if the defendant himself had the intent that Hopkins would use his vehicle in reckless disregard of the substantial risk of injury to Yaffe, then the defendant committed the crime as a joint venturer. There was no error.

*Judgments affirmed.*

---

[7]The judge instructed the jury that, in order to find the defendant guilty on a theory of joint venture, they had to find, beyond a reasonable doubt, that "the defendant was present at the scene of the crime"; that "the defendant knew that another person intended to commit the crim[e]"; that "the defendant himself shared that intent to commit the crim[e]"; that "the defendant agreed to participate in committing the crime"; and that "the defendant aided or assisted in the commission of the crime, or by agreement was willing and available to assist another person in carrying out the crime if necessary." These instructions were proper. *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856 (1997).