Following a jury trial, the defendant, Kenneth Ward, was convicted of five counts of rape of a child and six counts of indecent assault and battery on a child.[2] On appeal, the defendant claims that the judge improperly denied him several peremptory challenges of prospective jurors, that various statements were introduced in evidence in violation of the first complaint doctrine, and that the prosecutor made impermissible and prejudicial statements in her closing argument. We affirm.
1. Factual background. The offenses arise from the defendant's relationship with two young girls in his girl friend's extended family: Amy[3] and Barbara.[4] ,[5] Amy is the defendant's girl friend's niece and Barbara is Amy's younger half-sister.
When she was a child, Amy would visit her father, who lived in a house with a number of family members, including Amy's aunt, the defendant's girl friend (aunt). Amy testified that beginning when she was "a little girl in elementary school," the defendant would sexually abuse her.
The first time this happened, she was five or six years old, and was watching cartoons on a bed at the house shared by her father and aunt. The defendant put a pillow over her eyes, pulled down her pants and underwear, and put his tongue and hands on her vagina. When he did this, she urinated on herself. The incident ended when the defendant heard someone approach and quickly put her clothes back on.
The abuse continued over time, and when Amy was eight or nine, the defendant moved into a separate apartment with Amy's aunt and their infant son. Amy visited her aunt's apartment frequently on the weekends and after school, and the defendant would sexually abuse her every time she stayed at their apartment. The majority of the abuse happened in her cousin's room, where she would sleep when she stayed with them.
After everyone was asleep, the defendant would come into the room and pull Amy's pants down. He would put his tongue on and in her vagina, and touch her vagina and chest with his hands. He also sometimes put her hand on his penis and used it to masturbate himself. He would not speak to her during the assaults, a number of which occurred while Barbara was sleeping in the same room.
As Amy continued to grow older, the offenses continued, but she "gained a little bit of courage" and began to push the defendant away physically. As she became stronger, she noticed that he attempted abuse less and less frequently, and eventually stopped altogether when Amy was in high school. Ultimately, during a period of time in high school after the assaults had ended, Amy first disclosed the abuse to a boy friend, and made him promise not to tell anyone about what she had told him.
Barbara testified that because of her relationship with Amy, she was very close to Amy's aunt while growing up, and stayed at the apartment the aunt shared with the defendant approximately every other week. The defendant began to sexually abuse Barbara when she was six years old, waking her up by touching her chest under her shirt. While she pretended that she was asleep, he pulled down her pants, touched and penetrated her vagina with his fingers, and put her hand on his penis. When he was done, he pulled her pants back up.
After this, the defendant would sexually abuse Barbara each time she stayed at his home, always touching her chest and digitally penetrating her vagina, and sometimes using her hand to touch his penis. When she was eight or nine years old, the defendant also began putting his tongue on and in her vagina. When she was nine, he began to penetrate her vagina with his penis. He did not speak during these assaults, which continued until Barbara was fourteen or fifteen years old.
Barbara first disclosed the abuse to a close friend when she was in high school. Shortly after this, she and Amy disclosed the abuse to each other.
2. Discussion. a. Juror bias. The defendant challenges the judge's refusal to excuse for cause a member of the venire who, through "therapy or 12-step groups," had been acquainted with both perpetrators and victims of sexual violence. The defendant used a peremptory challenge to remove that juror, juror number (no.) 112, and later stated for the record his intent to use peremptory challenges to remove other jurors had his challenges not already been exhausted. Accordingly, the defendant's challenge of juror no. 112 for cause is preserved for review. See Commonwealth v. Clark, 446 Mass. 620, 629 (2006).
When conducting voir dire, a judge is required only to "determine whether jurors [are able to] set aside their own opinions, weigh the evidence (excluding matters not properly before them), and follow the instructions of the judge." Commonwealth v. Leahy, 445 Mass. 481, 495 (2005), quoting from Commonwealth v. Stroyny, 435 Mass. 635, 639 (2002). "A finding that a juror is impartial will not be overturned on appeal unless the defendant makes a clear showing of abuse of discretion or that the finding was clearly erroneous." Commonwealth v. Emerson, 430 Mass. 378, 384 (1999).
Here, during individual voir dire, the trial judge gave juror no. 112 a short summary of the case, indicating that it involved allegations of repeated incidents of sexual abuse of children. The judge then asked if there was anything about the allegations that would affect the juror's ability to afford the defendant a fair trial, and the juror answered, "I don't think so." When asked whether he or anybody he knew was a victim of sexual assault, the juror stated that he had participated as a member of therapeutic groups that included adults who had been sexually assaulted as children. When the judge asked if, in light of those connections, he could render a fair, just, and impartial verdict based on the evidence, the juror responded, "I think it would certainly make me alive to the realities of the consequences for someone who is a victim." The judge then refocused the juror on the original question, asking if he thought he "could do it," and the juror responded in the affirmative. Later in the voir dire, the juror indicated that he had also been acquainted with people "through those same circles" who had perpetrated sexual assaults. When asked if, given this, he would be able to render a fair, just, and impartial verdict in the case, he responded, "Yes. My sense is that it would be a wash. Yes."
"As a general principle, it is an abuse of discretion to empanel a juror who will not state unequivocally that he or she will be impartial." Commonwealth v. Colton, 477 Mass. 1, 17 (2017), citing Commonwealth v. Long, 419 Mass. 798, 804 (1995). Nonetheless, "[a] potential juror's use of seemingly equivocal language, such as the word 'probably,' is not determinative of the juror's ability to be impartial" (emphasis added). Commonwealth v. Jaime J., 56 Mass. App. Ct. 268, 274 (2002), citing Commonwealth v. Wilborne, 382 Mass. 241, 254 (1981) (permissible to empanel juror who "did not think" her friend's experience as a rape victim would affect her ability to be impartial); Commonwealth v. Ascolillo, 405 Mass. 456, 459-460 (1989) (permissible to empanel juror whose final answer was "[n]o, I don't think so," as to whether certain experiences would make him partial).
Here, juror no. 112 repeatedly stated that despite knowing individuals who had had experiences with sexual assault, he could nonetheless be impartial in evaluating the case. The juror's responses could reasonably be interpreted as unequivocal, and the judge implicitly found them so. The "trial judge was in the best position to evaluate [the juror's] credibility," and based on his observations of the juror's demeanor during questioning, he "was entitled to accept [the juror's] representation of impartiality." Commonwealth v. Ayoub, 77 Mass. App. Ct. 563, 566 (2010). There was no error.
b. Peremptory challenges. The defendant argues that the judge erroneously denied his request for two additional peremptory challenges when, after he had exhausted his sixteen initial challenges, two seated jurors were excused for hardship. He contends that had he known that the jury had three seats left to fill (rather than a single seat), he would have chosen to use his challenges differently. The defendant cites no authority, nor is this panel aware of any authority, in support of the proposition that a judge who unexpectedly excuses a sitting juror during empanelment is mandated to offer additional peremptory challenges to the parties.[6] The defendant received and exercised the sixteen peremptory challenges to which he was entitled, pursuant to Mass.R.Crim.P. 20, 378 Mass. 889 (1979). "[T]here is no support in this record that additional challenges were required in order to obtain an impartial jury." Leahy, 445 Mass. at 499, quoting from Commonwealth v. Lattimore, 396 Mass. 446, 450 (1985).
c. First complaint. The defendant claims that evidence presented by the Commonwealth at trial gave rise to multiple violations of the first complaint doctrine, and created reversible error. Specifically, the defendant challenges testimony regarding a conversation between Amy and Barbara about the defendant's abuse, and testimony regarding the content of Barbara's sexual abuse intervention network (SAIN) interview. We review for abuse of discretion. See Commonwealth v. Rivera, 83 Mass. App. Ct. 581, 583 (2013).
i. Conversation between Amy and Barbara On direct examination, the prosecutor elicited from Amy only that she had decided to talk with Barbara at some point about "what had happened," and that she did so in August of 2010. Of the short series of questions eliciting this information, the defendant objected only to the question "do you remember when that was?"
On cross-examination of Amy, defense counsel revisited this conversation repeatedly. He asked whether Barbara had indicated during the conversation that she had told a friend before telling Amy about the abuse. He asked as well whether during the conversation Amy had told Barbara about a dream she had had about the defendant. He also extensively questioned Amy about her and Barbara's life circumstances and family relationships at the time of the conversation.
Defense counsel continued to explore the conversation on cross-examination of Barbara,[7] inquiring about similar topics, and additionally asking whether the conversation included discussion of their mother. He then cross-examined Barbara extensively about prior statements she had made identifying the August, 2010, conversation with Amy as the first time she had disclosed the abuse, in contrast to her trial testimony.
On redirect, the prosecutor asked Barbara if her "whole conversation in August of 2010 [with Amy was] about the dream." Barbara responded in the negative, and over repeated objections, the prosecutor elicited a description of the conversation:
"She called me and said that she had a dream that Kenny was out to get her. And I said, what do you mean. And she said that he was trying to kill her. And I said, why are you having dreams like that.... She asked me did Kenny ever do anything to me. I said, what do you mean. She said, did he ever touch you. And I told her, yes."
Barbara then testified that Amy had told her "what had happened to her" as well. On recross, defense counsel again examined Barbara as to her inconsistent statements regarding her first disclosure of abuse.
We discern no prejudice from any error in the Commonwealth's introduction of evidence regarding the conversation between Barbara and Amy, as the conversation formed an essential part of the defense at trial. See Commonwealth v. McCoy, 456 Mass. 838, 851 (2010) ("Where the inconsistencies contained in the cumulative first complaint testimony were more important to the defense than the Commonwealth, there is no harm to the defendant"). That Amy and Barbara discussed the abuse in August of 2010 was essentially part and parcel of the defense case. Throughout the trial, the defendant forcefully argued that in the summer of 2010, the two collaborated in fabricating the allegations in order to gain sympathy from family members while managing difficult personal circumstances. He also argued that one of the sisters (Barbara) was not credible because she was inconsistent in who she claimed she had first disclosed the abuse to.[8]
Testimony elicited by the prosecutor about the content of the conversation "contained no repetition of the horrific details of the abuse" and was fairly brief. Commonwealth v. Revells, 78 Mass. App. Ct. 492, 499 (2010). Because the challenged testimony was not unduly inflammatory and, most importantly, because the defendant expansively capitalized on it throughout the trial, its admission did not prejudice the defendant.
ii. SAIN interview. Defense counsel cross-examined Barbara extensively about her SAIN interview, inquiring about the procedure and setting of the interview, and playing a small portion of it for the jury. He then highlighted the contradiction between Barbara's trial testimony and statements made in her SAIN interview as to the identity of the first person she had told of the abuse, and the age at which the abuse began.
Defense counsel inquired of Barbara whether she had said during the SAIN interview that she "didn't have a good memory of what happened," and that she did not recall what the defendant did to her at one of his residences.[9] He elicited that she had said during the SAIN interview that she thought Amy would be present during the interview, that she wanted her present, and that she had a "better recollection" of what happened when Amy talked about it. He additionally asked whether she had "rehearse[d]" her testimony with people at the district attorney's office prior to trial.
On redirect, the prosecutor elicited a brief summary of Barbara's SAIN interview. Over the defendant's objection, Barbara testified that she had told the SAIN interviewer that the defendant "made [her] touch him," touched her breasts and vagina, "performed oral sex" on her, kissed her, and put his penis "inside of [her]." At the conclusion of this series of questions, the prosecutor asked, "And all those details you told the interviewer, are those the same things that you've testified about?" Barbara responded in the affirmative.
The brief summary of Barbara's SAIN interview was proper. The defendant's cross-examination of Barbara insinuated that she was, at the time of the SAIN interview, unable to recall the abuse in any meaningful way without contemporaneous coaching from Amy. It was proper to allow the Commonwealth to elicit evidence in summary form demonstrating that Barbara's memory of the assaults at the time of the SAIN included the pertinent details of the offenses.
The first complaint doctrine "does not exclude testimony that 'is otherwise independently admissible' and serves a purpose 'other than to repeat the fact of a complaint and thereby corroborate the complainant's accusations.' " McCoy, 456 Mass. at 845, quoting from Commonwealth v. Arana, 453 Mass. 214, 220-221, 229 (2009). Here, admission of subsequent complaint testimony was proper because it "was received for the independent purpose of rebutting the inferences raised by the defendant's inquiries ... and was necessary for a fair understanding of the Commonwealth's case." Commonwealth v. Saunders, 75 Mass. App. Ct. 505, 510 (2009). There was no error in Barbara's summary.
We note, however, that Barbara's testimony affirming that the details she had told the SAIN interviewer were "the same things that [she had] testified about," was not admissible. See Revells, 78 Mass. App. Ct. at 499 (improper for victim to testify that she told police "everything that [she] told the jury here today"). Such a statement amounts to improper self-corroboration. Regardless, as the erroneously admitted statement was fleeting and insignificant in the context of Barbara's testimony, the evidence had " 'but very slight effect,' if any." Commonwealth v. Place, 81 Mass. App. Ct. 229, 233 (2012), quoting from Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).
d. Opening statement. The defendant argues that in her opening statement, the prosecutor improperly appealed to the jurors' emotions by referring to him as a "child molester" and to the offenses as "disgusting criminal acts that he perpetrated on [Barbara's and Amy's] young bodies."
"The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence." Commonwealth v. Staines, 441 Mass. 521, 535 (2004), quoting from Commonwealth v. Croken, 432 Mass. 266, 268 (2000). Use of the phrase "child molester" was descriptive, and not improper. We note that our courts have used the phrase "child molester" to describe an individual who has committed contact sexual offenses against children. See, e.g., Bisazza's Case, 452 Mass. 593, 594 (2008) ; Commonwealth v. Medina, 64 Mass. App. Ct. 708, 717 (2005). That the defendant committed such sexual offenses against Amy and Barbara when they were minors was precisely what the Commonwealth was attempting to prove at trial. To the extent that the phrase "was inflammatory, that was inherent in the odious ... nature of the crime[s] committed." Commonwealth v. Johnson, 429 Mass 745, 749 (1999), quoting from Commonwealth v. Sanchez, 405 Mass. 369, 376 (1989).[10]
The prosecutor's characterization of the offenses as "disgusting" was better left unsaid, but ultimately falls into the category of "merely 'enthusiastic rhetoric.' " Commonwealth v. Barbosa, 477 Mass. 658, 669 (2017), quoting from Commonwealth v. Simpson, 434 Mass. 570, 586 (2001). Any impropriety in the characterization was ameliorated by the judge's clear instructions that opening statements are not evidence.
e. Closing argument. During and after the prosecutor's closing argument, the defendant made several objections, and moved for a mistrial. His objections were overruled, and his motion was denied. On appeal, the defendant raises various claims of error in these rulings, arguing that the errors were prejudicial and require reversal.
Where a defendant objects to statements in the Commonwealth's closing argument, "the standard for determining whether a conviction must be reversed ... is whether [any] improper statements made by the prosecutor 'constituted prejudicial error.' " Commonwealth v. Rosario, 430 Mass. 505, 515 (1999), quoting from Commonwealth v. Daggett, 416 Mass. 347, 352 n.5 (1996). We evaluate statements made during closing argument "in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." Commonwealth v. Whitman, 453 Mass. 331, 343 (2009). We note that during the trial, the judge instructed the jury multiple times that the statements of the lawyers are not evidence.
i. Reasonable doubt. The defendant argues that the prosecutor made two remarks during her closing that improperly minimized the Commonwealth's burden to prove the defendant's guilt beyond a reasonable doubt. He objected to each contemporaneously. The first of these remarks was as follows:
"[T]he Court is going to instruct you on reasonable doubt. Reasonable doubt is not some metaphysical standard set high in the sky.... It is a standard used by juries in this Commonwealth and grounded in common sense."
"[I]t was not good practice for the prosecutor to discuss the definition of 'reasonable doubt' in the closing argument." Commonwealth v. Deloney, 59 Mass. App. Ct. 47, 53 (2003). When viewed as a whole and in the context of the entire closing argument, however, "it is apparent that the prosecutor was attempting ... merely to suggest that the jury rely on common experience and common sense in reaching their verdicts." Commonwealth v. Cook, 419 Mass. 192, 203 (1994).
To the extent that the statement improperly minimized the Commonwealth's burden, the judge fully and properly instructed the jurors on reasonable doubt, reminding them that they must accept the law as he instructed them. He addressed the prosecutor's argument, noting that though "[c]ounsel made comment of the burden of proof ... this is the charge on it, and I ask you to be guided by this charge on the issue of burden of proof." "That was the last word the jury heard on the subject and cured any misimpression the prosecutor's misstatements might have caused." Commonwealth v. Snow, 30 Mass. App. Ct. 443, 447 (1991). Accord Commonwealth v. Rupp, 57 Mass. App. Ct. 377, 385 (2003) (any prejudice resulting from prosecutor's statements in closing, which "tended to trivialize the concept of reasonable doubt," was cured by judge's instructions).
The defendant also challenges the final line of the prosecutor's argument: "Yours is not the search for doubt but ... the search for truth."[11] Though it was not appropriate for the prosecutor to define the jury's role, the remark was ultimately harmless. See Commonwealth v. Lanoue, 392 Mass. 583, 590-591 (1984). See also Commonwealth v. Randolph, 415 Mass 364, 367 (1993. Cf. Commonwealth v. Hubbard, 69 Mass. App. Ct. 232, 241 n.5 (2007).
ii. Impermissible vouching. The defendant contends that the prosecutor made three comments during her closing argument that improperly suggested to the jury that Amy and Barbara should be believed because they were willing to testify at trial and had no motive to lie.
"[T]here is no categorical prohibition against suggestion by a prosecutor that a prosecution witness has no motive to lie." Commonwealth v. Helberg, 73 Mass. App. Ct. 175, 179 (2008). A prosecutor may argue that a witness had no motive to lie as a "fair response to an attack on the credibility of a government witness." Commonwealth v. Smith, 450 Mass. 395, 408 (2008), quoting from Commonwealth v. Chavis, 415 Mass. 703, 713 (1993). A prosecutor may not, however, "suggest the jury should believe a witness merely because the witness testified." Commonwealth v. Olmande, 84 Mass. App. Ct. 231, 234 (2013).
We review each of the three challenged statements in turn, in light of those principles. The first is as follows:
"[The defendant] didn't think of the fact that those two girls were going to come into this courtroom and tell us their secret. The older girls now had strength who found the words, to confront him in this room, and tell a room full of strangers exactly what he did to their bodies."
The prosecutor made this statement in the course of an introduction to her argument suggesting that the defendant believed he had committed "the perfect crime." After pointing out that at the time of the offenses, Amy and Barbara were "two little well behaved girls," in a "loving family ... who want[ed] to trust each other," she suggested that the defendant did not account for the fact that the girls would grow up and ultimately disclose the offenses.
The challenged statement is somewhat overwrought in tone, and "crept perilously close to the line" by alluding to the potential embarrassment of testifying. Deloney, 59 Mass. App. Ct. at 53. Nevertheless, the statement was introductory in nature, and did not advance the impermissible inference that the jury should find the victims credible by virtue of their testifying. Contrast Olmande, 84 Mass. App. Ct. at 234 (prosecutor's remark improper where she suggested "there is only one thing that would motivate" victim to come to court and "talk about events that are extremely humiliating in front of a room of strangers ... and that's the truth, because she's telling the truth"). In context, the statement was permissible rhetoric. See Commonwealth v. Anderson, 411 Mass. 279, 287 (1991) (jury had capacity to "discount hyperbole" in prosecutor's remarks made with "dramatic flourish").
The second statement the defendant challenges is:
"What did they gain? [The cousin], the beloved cousin. What did they gain? Think about [Barbara] talking about how hard it is to lose [that cousin]. They have gained nothing."
The prosecutor made this statement while discussing the rifts arising in Amy and Barbara's family after the disclosure of abuse, arguing that they gained nothing from the disclosure because the family was "torn apart by [it]." The argument was a permissible response to the defendant's suggestion that the victims fabricated the story specifically in order to get their family to "rally behind [them]," and to get "sympathy out of people, to get love and care and affection out of people."
Third, the defendant challenges the prosecutor's statement, "[Barbara] and [Amy], no motive. No way. Painful details, painful consequences of telling." Though inartful, the statement did not constitute error. The prosecutor was entitled to argue that Amy and Barbara had no motive to lie as a response to the defendant's forceful argument that the two had fabricated the abuse together to gain family support. Though the phrase "[p]ainful details" is unfortunate, it appears in context to have been a reference to the level of detail in the witnesses' testimony, rather than to any subjective discomfort the testimony may have caused Amy and Barbara.[12]
To the extent that the jury may have misunderstood this reference, the remark was brief and fleeting, and gave rise to no prejudice in the context of a closing argument spanning approximately twenty pages of transcript. See Deloney, 59 Mass. App. Ct. at 53 (no prejudice in "brief error at the conclusion of a closing argument that spanned eleven pages").
iii. Disparagement of defense. The defendant argues that a number of statements in the prosecutor's closing argument constituted unfair disparagement of the defense and burden-shifting. In particular, he challenges statements in which the prosecutor suggested that defense counsel was making an "illogical, unfounded accusation" against Amy, and that he "want[ed the jury] to think this is all one big lie for some unclear motive." He also challenges the prosecutor's exhortation not to "let him blame [Amy] for what this guy did to [Barbara]."
Prosecutors are permitted to forcefully argue the "inherent implausibility or unreliability" of a defendant's claim or theory of defense. Commonwealth v. Gerhartsreiter, 82 Mass. App. Ct. 500, 513, 514 (2012) (prosecutor properly characterized insanity defense as "the culminating manipulation in a lifetime of lies" and exhorted the jury not to "let him get away with that"). "[D]efense trial tactics are not immune from comment in a prosecutor's final argument provided the comment is based on evidence heard by the jury." Commonwealth v. Bradshaw, 385 Mass. 244, 272 (1982). Accordingly, it is not improper for a prosecutor to suggest that the defendant attempted to confuse, distract, or "fool" a jury. Commonwealth v. Shea, 401 Mass. 731, 739 (1988).
Contrary to the defendant's argument, the challenged statements neither constituted burden-shifting, nor did they unfairly criticize proper trial tactics. Contrast Commonwealth v. Grandison, 433 Mass. 135, 143 (2001) (prosecutor improperly suggested that it was "impermissible for defense counsel to question the veracity of the police officers"). Defense counsel sought to convince the jury that Amy and Barbara fabricated the allegations to gain sympathy and support from their family, and that they seemed emotional at trial because they regretted their fabrication. The prosecutor was proper in arguing that this theory was unfounded, and urging the jury to reject it. See Chavis, 415 Mass. at 713 ("prosecutor may make a fair response to an attack on the credibility of a government witness").
Judgments affirmed.

The defendant was indicted as a subsequent offender as to four of the rape charges and four of the indecent assault and battery charges. After the defendant was convicted of the underlying offenses, the Commonwealth entered a nolle prosequi as to the subsequent offender portions of the indictments.

A pseudonym.

A pseudonym.

At the time of trial, Amy was twenty-four years old and Barbara was nineteen years old.

A judge may, of course, choose in his discretion to offer additional challenges to the parties in such a situation. See Commonwealth v. Barbosa, 457 Mass. 773, 804 n.28 (2010) (judge offered each party one additional peremptory challenge where juror was dismissed due to illness).

The prosecutor did not introduce information about the conversation at issue during her direct examination of Barbara.

Indeed, the defendant's opening statement suggests that he intended at the outset to elicit information about the conversation at issue, asking the jury to focus on "the people that these two sisters will say they first told about the sexual abuse, and [that] one case has flip-flopped. First it was this person, then it was that person."

At trial, Barbara testified in detail that multiple assaults took place at that residence.

We note as well that in describing the charged offenses, both Amy and Barbara testified multiple times, without objection, that the defendant had "molested" them.

The prosecutor repeated the phrase twice, each time interrupted by defense counsel's objection.

At the outset of her argument, the prosecutor indicated that she would be asking the jury to focus on three categories of evidence: "First of all, the testimony of [Barbara] and [Amy] who came into this courtroom, painful detail, unwavering testimony." Immediately after beginning this section of the argument, she remarked that Amy had testified "in excruciating detail about the abuse." The challenged statement concluded this first section of the argument, and appears to have referred back to these similar phrases.